[Nos. 7325–4–III; 7308–4–III.   Division Three.   July 2, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. MATT
RICHARD JAMES, *Appellant.*

*In the Matter of the Personal Restraint of*
MATT RICHARD JAMES, ET AL,
*Petitioners.*

*Frank V. Bartoletta* and *Sanger & Bartoletta,* for appellant James.

*Roger J. Peven* and *Hackney, Peven, Schwartz & Beukelman,* for petitioner Perry.

*Donald C. Brockett, Prosecuting Attorney,* and *Ronald Skibbie, Deputy,* for respondent.

THOMPSON, J.—This case is before the court on the personal restraint petitions of Matt James and Barbara Perry, and on an appeal of Mr. James' exceptional sentence. Both defendants were jointly represented at a single trial by the same attorney, Steven Harris.[1] Mr. James was charged with three counts of first degree robbery and one count of possession of a controlled substance. Ms. Perry was charged with one count of first degree robbery and one count of possession of a controlled substance. The defendants were

---

[1] Mr. Harris is currently suspended from the practice of law in Washington, pending the outcome of disciplinary proceedings pursuant to RLD 3.2(a).

convicted on all counts. Both defendants in affidavits raise the issue of ineffective assistance of counsel, which this court treated as personal restraint petitions. The petitions were transferred to the Spokane County Superior Court for a reference hearing pursuant to RAP 16.11(b) and 16.12. Findings of fact were entered. We have reviewed the findings and the record before us, and conclude an actual conflict of interest adversely affected Steven Harris' representation of the defendants. We accordingly reverse their convictions.

In February 1985, a series of pharmacy robberies occurred in Spokane. On February 20, 1985, Huxsol's Pharmacy was robbed by a lone gunman. The store clerk and pharmacist got clear views of the robber's face. The robber demanded narcotics and fled the store after obtaining Percodan and Valium.

On February 22, the Manito Pharmacy was robbed. A male gunman, assisted by an accomplice who appeared to be either a young boy or a female disguised as a boy, demanded narcotics, this time with a list. The store clerk, pharmacist, and a customer were all bound with duct tape. The list was left behind.

The next robbery in the series occurred February 26, at Herbison's Pharmacy. The pharmacist, a number of employees, and several customers were in the store at the time. A gunman armed with a sawed-off shotgun demanded narcotics, producing a note listing various types. A disguised accomplice assisted by escorting employees and customers to the rear of the store. Duct tape was again used to bind the employees and customers. One of the customers, before entering the store, noticed a suspicious 1950 white-over-turquoise Chevrolet pickup outside. The pickup was later identified by the customer in a drive-by of the residence where the defendants lived.

After obtaining a search warrant, the police searched the residence, seizing a variety of empty drug bottles, codeine powder and residue, drug paraphernalia, a sawed-off shotgun and a leather thong used as a sling for the shotgun, a

small caliber revolver, some clothing, a torn–up robbery note, and a notebook. Mr. James was charged with all three robberies. Ms. Perry was charged with only the Herbison robbery.

At trial, several witnesses, including the three pharmacists, identified Matt James as the male robber. Most of these witnesses previously identified Mr. James in a lineup. Ms. Perry was positively identified as the female robber in the Herbison's Pharmacy robbery, although some evidence came in during trial linking her to the Manito Pharmacy robbery. The clothing seized was identified by witnesses as that worn by the two robbers. The State's handwriting and fingerprint experts linked the note left behind at the Manito Pharmacy robbery with the note found at the defendants' residence, concluded fingerprints on the notes were those of Matt James, and testified the notes had been produced from a notebook bearing Mr. James' name, also found at the residence.

Before trial, Mr. Steven Harris replaced public defenders originally assigned to Mr. James and Ms. Perry. Both defendants testified at the reference hearing that he came to the jail and solicited them, claiming he would do a better job than the public defender's office. Judge Luscher, at arraignment, and Judge Grant, on the second day of trial, asked Mr. James and Ms. Perry whether they knew they could have separate counsel; whether they understood what conflict of interest meant; whether they had discussed this with Mr. Harris, and whether they wished to go to trial with one attorney representing both of them. They replied in the affirmative to all questions. No motion was made to sever their trials. At all times Mr. Harris assured the court no conflict of interest was presented by his joint representation of the defendants.

At trial, an in camera discussion was held at Mr. Harris' request in which he told Judge Grant he suspected the defendants planned to perjure themselves, and that a proposed defense witness, Tim Logan, was suspected of planning perjury. Mr. Harris also stated he had decided not to

call Mr. Logan based on his impeachability. He discussed his doubts as to whether Barbara Perry would testify and asked for a recess to talk this over with his clients.

During trial, Mr. Harris, for the most part, relied on police reports to attack the lineup identifications, bringing out the fact some of the witnesses had identified another individual in lineups as the male robber. He acknowledged he had not interviewed the State's experts.

Some of the defendants' proposed witnesses were not called by Mr. Harris, including Tim Logan and Dr. Piper. Mr. Logan would have testified he was with Mr. James at some time on February 20, the date of the Huxsol's Pharmacy robbery, and that Mr. James was laid up with a back problem. Dr. Piper would have confirmed Mr. James visited him for a back problem about noon that day, and that Percodan was prescribed for pain. Although Mr. Harris lost certain medical records verifying the doctor's visit, they were obtained by Mr. James' mother during trial and introduced as evidence.

Mr. James testified and Ms. Perry did not. Mr. James admitted he was an opiate addict and lived in a house frequented by drug users. He admitted the robbery notes were written by him, but for another addict named "Tom". He denied robbing to get drugs. He testified that after a back injury on February 19, 1985, he visited Dr. Piper, received Percodan, and was incapacitated for about a week. He denied ever having seen the sawed-off shotgun seized from the apartment.

During trial, the prosecutor brought to the court's attention an incident which occurred in the courthouse lunchroom. Two victim witnesses told Mr. Skibbie, the prosecutor, that during lunch they were in line behind Mr. Harris and Ms. Perry, and overheard them speaking loudly regarding one of the State's witnesses, implying the witness was either badly mistaken or lying. Jurors, wearing their jury badges, were also present in the lunchroom. Judge Grant severely chastised Mr. Harris. This incident was never discussed in the jury's presence.

Mr. James was convicted of three counts of first degree robbery and one count of possession of a controlled substance. A special deadly weapon finding was made. Ms. Perry was convicted of one count of first degree robbery and the possession count. A deadly weapon finding was also made as to her.

After the verdict, new counsel were retained for each defendant. At Mr. James' sentencing hearing, at the State's request, the court sentenced Mr. James to the maximum computed under the sentencing reform act for each count of robbery, and added the statutory 24–month deadly weapon enhancement. Then the court entered exceptional sentence findings and ran the sentences consecutively, rather than concurrently. Mr. James appeals his sentence. Because we reverse based on our holding the defendants were denied effective assistance of counsel, we need not address sentencing issues.

Mr. James and Ms. Perry take two approaches to argue their ineffective assistance of counsel claims. The first may be termed the deficient performance rule. It involves their claims that Mr. Harris' trial and pretrial performance fell below an objective standard of reasonableness, and that this deficiency prejudiced them. *See Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under the second approach, they contend Mr. Harris' representation of both of them at a single trial created an actual conflict of interest. If an actual conflict is demonstrated, no prejudice need be shown before automatic reversal is required. *See Cuyler v. Sullivan,* 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980).

With respect to the deficient performance standard, defendants claim, among other things, that Mr. Harris failed to inform them of a potential plea bargain whereby they could have pleaded guilty in exchange for dropping the deadly weapon enhancements. Under the actual conflict of interest approach, Ms. Perry alleged Mr. Harris told her she must testify to aid Mr. James' case, and that she would have to testify falsely. Both defendants say Mr. Harris

solicited them in the jail, and never discussed conflict of interest with them. Finally, both contend Mr. Harris never informed them about his concerns that they planned to commit perjury, and never told them of the subjects discussed in the in camera discussion with Judge Grant. To allow additional testimony and to provide a forum for consideration of the issues raised, this court ordered a reference hearing. The reference hearing and the resultant findings did not resolve this court's major concerns. Neither the State nor the defendants subpoenaed Steven Harris and, without his testimony, the defendants' allegations are largely uncontroverted. Thus, without making our own findings of fact, which we may not do, serious and troubling aspects of this case must go unresolved.

We first address issues raised concerning whether Mr. Harris' performance constituted ineffective assistance of counsel.

### DEFICIENT PERFORMANCE; THE STRICKLAND RULE

The test for ineffective assistance of counsel, other than where an actual conflict of interest is claimed, is whether (1) defense counsel's performance fell below an objective standard of reasonableness, and (2) whether this deficiency prejudiced the defendant. *Strickland v. Washington, supra; State v. Sardinia,* 42 Wn. App. 533, 540, 713 P.2d 122 (1986). As to the first prong, there is a strong presumption of adequate assistance of counsel. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. As to the second, there must be a showing there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The focus must be on the fundamental fairness of the proceeding. Finally, no particular order of inquiry is necessary; thus, a court need not determine the performance component before examining the prejudice factor. *Strickland,* 466 U.S. at 697, 104 S. Ct. at 2069.

Counsel for the defendants, and Mr. James, pro se, make the following claims of deficient performance: (1) Mr. Harris' failure to discuss a proposed plea bargain with them; (2) failure to interview the State's handwriting and fingerprint witnesses, and the victim witnesses prior to trial; (3) failure to call certain alibi witnesses; (4) failure to examine potential exhibits such as lineup reports, and losing others; (5) the "lunchroom incident" wherein Mr. Harris and Ms. Perry were overheard discussing the case in front of witnesses and jurors; (6) the in camera discussion of suspected perjury; (7) Mr. Harris' questioning of a witness and argument about evidence (fingerprints on a Tylenol bottle) from an unrelated case.

With regard to Mr. Harris' alleged failure to contact witnesses and adequately investigate and prepare for trial, including his failure to examine the State's experts, a complete reading of the record indicates no reasonable probability that, but for these alleged errors, the result of the proceeding would have been different. Hence, we need not decide whether Mr. Harris' performance was deficient, which would be difficult in any event, based, as we noted, on the lack of his testimony at the reference hearing. There was overwhelming evidence of guilt, and the only plausible defense, misidentification, was pursued. Mr. Harris did probe and bring out the weaknesses of the State's case with regard to the identification issues.

Mr. James testified to his alibi that he was in bed with a back problem on the date of one of the robberies. Proof of his visit to Dr. Piper on the day one of the robberies occurred was presented in testimony and through medical records. Thus, Mr. James' alibi witness, Dr. Piper, would have added little if anything to the testimony and records presented. Mr. Harris' decision not to call Tim Logan was a reasonable tactical decision given Mr. Logan's impeachability. The lunchroom incident, while disturbing behavior, could in no way have prejudiced the defendants. The incorrect questioning concerning the Tylenol bottle could not have affected the jury's perception of the damning evidence

presented. Finally, as for the in camera disclosure of antici-
pated perjury, that issue more properly arises in consider-
ing whether an actual conflict of interest occurred, rather
than under the *Strickland* incompetent performance/prej-
udice rule.

Given the strength of the State's case wherein over-
whelming evidence of guilt was presented, the only area of
allegedly deficient performance that could meet the preju-
dice prong of the *Strickland* test would be failure to discuss
plea bargain negotiations.[2] The evidence of guilt does not
affect the "proceeding" at issue here, *i.e.,* the plea hearing
and sentence received. While Ms. Perry testified Mr. Harris
mentioned to her he had rejected a tentative bargain, both
defendants testified they were not informed the State
would consider dropping the deadly weapon enhancement
charges in exchange for guilty pleas, and were not given the
opportunity to consider such an offer. Both testified they
would have considered accepting.

The State concedes there were conversations with Mr.
Harris concerning dropping deadly weapon enhancement
charges. But the State's affidavit asserts Steven Harris told
the deputy prosecuting attorney he had discussed the ten-
tative offer with his clients, and they would be proceeding
to trial unless the State was willing to reduce the substan-
tive charges. Thus, we are faced with the defendants' testi-
mony as to what did or did not occur, a hearsay refutation
of that, and no testimony from the key actor in the alleged
failure to communicate, Steven Harris. Although, as noted,
we cannot resolve this on the state of the current record, we

---

[2]The United States Supreme Court in *Hill v. Lockhart,* 474 U.S. 52, 88 L. Ed.
2d 203, 106 S. Ct. 366, 370 (1985) held the *Strickland* test applicable to claims of
ineffective assistance of counsel in the plea process, *i.e.,* the defendant deciding
whether to plead guilty and accept a bargain or plead not guilty and proceed to
trial. While the validity of a guilty plea is different from the validity of the plea
process where an accused pleads not guilty, the test for ineffective assistance of
counsel should be the same. *See also Johnson v. Duckworth,* 793 F.2d 898, 899
(7th Cir. 1986). That is because the result of an error by counsel at this critical
stage of the proceedings can have as serious an effect on the defendant who pleads
not guilty as on the defendant who pleads guilty.

make clear failure to communicate a plea bargain or failure to discuss a potential plea bargain may constitute ineffective assistance of counsel.

Defense counsel is under an ethical duty to discuss plea negotiations with his clients, under either the old Code of Professional Responsibility or the new Rules of Professional Conduct. *See* RPC 1.2; CPR DR 7–101, EC 7–7, 7–8. *See also* 1 American Bar Ass'n, *Standards for Criminal Justice,* Std. 4–6.2(a) (2d ed. 1980 & Supp. 1986). If he did not, a breach occurred, indicating deficient performance.

Plea bargaining has been recognized as "an essential component of the administration of justice". *Santobello v. New York,* 404 U.S. 257, 260, 30 L. Ed. 2d 427, 432, 92 S. Ct. 495, 498 (1971). A defendant is entitled to counsel in plea negotiations and in the plea process, under the Sixth Amendment and article 1, section 22 of the Washington State Constitution. *State v. Swindell,* 93 Wn.2d 192, 198, 607 P.2d 852 (1980); *State v. Johnson,* 23 Wn. App. 490, 497, 596 P.2d 308 (1979). The counsel required is effective counsel.

■ In a plea bargaining context, effective assistance of counsel requires that counsel "'actually and substantially [assist] his client in deciding whether to plead guilty.'" *State v. Osborne,* 102 Wn.2d 87, 99, 684 P.2d 683 (1984) (quoting *State v. Cameron,* 30 Wn. App. 229, 232, 633 P.2d 901 (1981)). This must include not only communicating actual offers, but discussion of tentative plea negotiations and the strengths and weaknesses of defendants' case so that the defendants know what to expect and can make an informed judgment whether or not to plead guilty.

Other jurisdictions have held that failure to advise a client of a plea bargain offer amounts to ineffective assistance of counsel. *See Johnson v. Duckworth,* 793 F.2d 898, 902 (7th Cir. 1986); *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435, 438 (3d Cir. 1982); *United States ex rel. Simon v. Murphy,* 349 F. Supp. 818 (E.D. Pa. 1972); *People v. Brown,* 177 Cal. App. 3d 537, 223 Cal. Rptr. 66 (1986); *State v. Simmons,* 65 N.C. App. 294, 309 S.E.2d 493 (1983);

*Harris v. State,* 437 N.E.2d 44, 45–46 (Ind. 1982); *Commonwealth v. Napper,* 254 Pa. Super. 54, 385 A.2d 521, 10 A.L.R.4th 1 (1978); *see generally* Annot., *Adequacy of Defense Counsel's Representation of Criminal Client Regarding Plea Bargaining,* 8 A.L.R.4th 660 (1981). A leading case is *Lyles v. State,* 178 Ind. App. 398, 382 N.E.2d 991 (1978) where the defense attorney ostensibly left plea negotiations to communicate the offer to his client, but in fact never informed the client. The attorney told the prosecutor and judge his client was refusing the bargain and would plead not guilty, similar to what the defendants have alleged here. The defendant in *Lyles* was convicted and sentenced to 10 years for armed robbery; the offer was an opportunity to plead to an offense with a recommendation of a 1– to 5–year sentence. The court cited *ABA Standards Relating to the Defense Function* § 6.2(a) (Approved Draft, 1971):

> In conducting discussions with the prosecutor the lawyer should keep the accused advised of developments at all times and *all proposals made by the prosecutor should be communicated promptly to the accused.*

*Lyles,* at 401. The finalized American Bar Ass'n, *Standards for Criminal Justice* are the same. 1 American Bar Ass'n, *Standards for Criminal Justice,* Std. 4–6.2(a). The commentary to standard 4–6.2 notes that "[T]he accused, not the lawyer, has the right to decide on prosecution proposals". The *Lyles* court found the attorney clearly and flagrantly breached his duty to the client, and that the disparity between the sentence received and the potential outcome of acceptance showed the necessary prejudice.

As to the uncertainty of whether plea bargain negotiations would have resulted in a consummated bargain, uncertainty should not prevent reversal where "confidence in the outcome" is undermined. *See People v. Brown,* 223 Cal. Rptr. at 78 n.22; *Commonwealth v. Napper,* 385 A.2d at 524; *Lyles,* 382 N.E.2d at 994 n.5. The standard is whether there is a reasonable probability that but for an attorney's error, a defendant would have accepted a plea

agreement. *Hill v. Lockhart,* 474 U.S. 52, 88 L. Ed. 2d 203, 106 S. Ct. 366, 370 (1985). If we were presented with a finding, supported by substantial evidence, that in fact Steven Harris failed to convey the plea negotiation to his clients, we would have no hesitation in concluding they were denied effective assistance of counsel by this error alone. In Barbara Perry's case, her sentence included a 24–month deadly weapon enhancement which would not have been added had the bargain been taken. In Matt James' case, each count was enhanced, substantially increasing his sentence.

### Actual Conflict of Interest

The second basis for alleging ineffective assistance of counsel involves conflict of interest. The State argues, and the judge at the personal restraint petition reference hearing found, that the defendants waived the conflict issue by their insistence on joint representation. The defendants were told on at least two separate occasions they had the right to separate counsel and were asked whether they knew about conflict of interest. However, waiver must be evidenced by an intentional relinquishment of a known right and be knowing and intelligent. *Johnson v. Zerbst,* 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A.L.R. 357 (1938); *State v. Alexis,* 21 Wn. App. 161, 168, 584 P.2d 963 (1978). Even where the court inquires of the defendants whether they have made an informed choice as to joint representation, this will not necessarily prevent a subsequent claim of ineffective assistance if there is an actual conflict of interest. As noted by Justice Marshall, concurring in part and dissenting in part in *Cuyler v. Sullivan,* 446 U.S. 335, 354 n.1, 64 L. Ed. 2d 333, 100 S. Ct. 1708, 1721 (1980):

> The dangers of infringing the defendants' privilege against self–incrimination and their right to maintain the confidentiality of the defense strategy foreclose the type of detailed inquiry necessary to establish a knowing and intelligent waiver.

*See also United States v. Sutton,* 794 F.2d 1415, 1421 (9th Cir. 1986); *United States v. Carrigan,* 543 F.2d 1053, 1058 (2d Cir. 1976) ("It would be a rare defendant who could intelligently decide whether his interests will be properly served by counsel who also represents another defendant"); *United States v. Sullivan,* 529 F. Supp. 646, 649 (S.D.N.Y. 1982).

Here, both defendants insist Mr. Harris did not fully discuss potential conflicts with them, urged them to accept joint representation because it was their best chance of winning acquittal, and told them the questions from the judges would be mere formalities. They also testified he solicited them in the jail. In this context, a serious doubt as to effective waiver exists.

The judges who questioned the defendants regarding joint representation did what they could in light of the responses they received from Ms. Perry and Mr. James, but they had no control over the attorney's advice to his clients. Trial judges faced with defendants' requests for joint representation by an attorney of their choice cannot be faulted for attempting to accommodate the defendants' request. However, in the absence of clear proof defendants have relinquished a known right, we are reluctant to find a waiver has occurred when a specific instance of conflict exists or later develops. We will not find one here.

■ Joint representation is not per se a violation of the Sixth Amendment right to effective assistance of counsel. *Holloway v. Arkansas,* 435 U.S. 475, 482, 55 L. Ed. 2d 426, 98 S. Ct. 1173, 1177 (1978). If no objection is raised at trial, a defendant must demonstrate actual conflict of interest adversely affected his lawyer's performance. *Cuyler; Sutton,* 794 F.2d at 1419; *State v. Lingo,* 32 Wn. App. 638, 644, 649 P.2d 130 (1982). However, if such actual conflict is demonstrated, no showing of prejudice to the defendant is necessary before automatic reversal is required. *Holloway,* 435 U.S. at 488, 98 S. Ct. at 1181.

The actual conflict necessary to require reversal must be readily apparent—the mere fact of dual representation does

not give rise to an inference of ineffective assistance of counsel. *Lingo,* at 646; *Holloway,* 435 U.S. at 482, 98 S. Ct. at 1177; *Cuyler,* 446 U.S. at 348, 100 S. Ct. at 1718. As one federal court has put it:

> We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests" [quoting from *United States v. Fox,* 613 F.2d 99, 102 (5th Cir. 1980)].

*United States v. Mers,* 701 F.2d 1321, 1328 (11th Cir. 1983). Where an attorney has made a choice between alternative courses of action, such as deciding not to put on certain evidence helpful to one client and harmful to the other, a specific instance is apparent. *Mers,* at 1328.

Another potential conflict exists when defense counsel feels compelled to align himself against his client by telling the court he thinks his client is about to lie on the stand. The State correctly points out that CPR DR 7–102, in effect at the time of trial, precludes knowing use of perjured testimony, or participation in the creation or preservation of evidence "when he knows or it is obvious that the evidence is false". The State refers to *Nix v. Whiteside,* 475 U.S. 157, 89 L. Ed. 2d 123, 106 S. Ct. 988 (1986), where the issue was whether an attorney's advice to a client that the attorney would seek to withdraw if the client insisted on committing perjury was a violation of defendant's Sixth Amendment right to assistance of counsel. *Nix* held that because a criminal defendant does not have a right to commit perjury, the attorney's response was correct and therefore no prejudice could be shown under the *Strickland* test for ineffective assistance of counsel. However, in *Nix* there was a specific factual finding that the defendant contemplated perjury, and the fact was never disputed. *Nix,* 106 S. Ct. at 1002–03. Here, Mr. Harris' discussion with Judge Grant reveals he only had *suspicions* his clients might perjure themselves, and that he "sensed" their proposed alibi witness, Tim Logan, would do likewise. This situation was discussed by Justice Blackmun in his concurring opinion in

*Nix.* He refers to *United States ex rel. Wilcox v. Johnson,* 555 F.2d 115 (3d Cir. 1977), in stating:

> Whether an attorney's response to what he sees as a client's plan to commit perjury violates a defendant's Sixth Amendment rights may depend on many factors: how certain the attorney is that the proposed testimony is false, the stage of the proceedings at which the attorney discovers the plan, or the ways in which the attorney may be able to dissuade his client, to name just three. . . . Except in the rarest of cases, attorneys who adopt "the role of the judge or jury to determine the facts," [citing *Wilcox*] pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment.

*Nix,* 106 S. Ct. at 1006. *See also Lowery v. Cardwell,* 575 F.2d 727, 731 n.5 (9th Cir. 1978).

As in *Wilcox,* there is no evidence or factual finding Mr. James or Ms. Perry intended to or did perjure themselves, other than Mr. Harris' "gut level belief". Mr. James testified he was never informed of the subjects discussed in the in camera hearing. If Mr. Harris discussed his belief with Judge Grant without a firm basis and without first communicating his suspicions to his clients and trying to dissuade them from false testimony, he violated his duty of loyalty to his client. As the court in *Wilcox,* at 122, emphasized:

> If an attorney faced with this situation were in fact to discuss with the Trial Judge his belief that his client intended to perjure himself, without possessing a firm factual basis for that belief, he would be violating the duty imposed upon him as defense counsel. While defense counsel in a criminal case assumes a dual role as a "zealous advocate" and as an "officer of the court," neither role would countenance disclosure to the Court of counsel's private conjectures about the guilt or innocence of his client.

Not knowing what discussions occurred between Mr. Harris and his clients, we cannot rely upon this allegation of unprofessional and disloyal conduct for our ultimate disposition. We observe, however, that the fine line between premature disclosure of suspicions and ethically mandatory

disclosure of perjury can easily be crossed if an attorney does not have more than a "gut level belief" his clients plan to testify falsely. When that line is crossed, an actual conflict of interest arises.

*State v. Lingo, supra,* identified trial strategy potentially favorable to one defendant but detrimental to the other as another kind of conflict necessitating reversal. *Lingo,* at 644. In *Lingo* the court also commented on the conflict created when one codefendant testifies and another does not. *See also Alvarez v. Wainright,* 522 F.2d 100, 106 (5th Cir. 1975). In finding no conflict on the facts of the case before it, the court commented: "There is no assertion made by counsel on appeal that trial counsel suggested one defendant testify, and not the other; . . ." *Lingo,* at 646. Here, however, defendants make a similar assertion and have presented testimony to that effect. Ms. Perry testified she was told by Mr. Harris she would have to testify falsely in order to aid Mr. James' case. Although Mr. Harris has not given testimony on this issue, we note he informed Judge Grant during trial that his clients were telling him different stories, and that Barbara Perry might not testify due to her physical inability. Mr. Harris also told Judge Grant:

> I would like to ask for a recess to discuss this matter fully with both James and Perry, because initially it had been her intention to testify. Now she says she isn't going to testify and won't testify, *and I want to make sure that they're aware of all the ramifications; that if she doesn't testify what that could do to Mr. James' case.*

(Italics ours.)

The State insists Ms. Perry did not testify because she could have been impeached by a prior conviction, and was physically unable to testify. However, if not testifying would have been detrimental to Mr. James' case, as represented by Mr. Harris in the in camera hearing, this alone necessitated separate counsel or a motion to sever trials. It is apparent Mr. Harris knew of this conflict since he mentioned it in his in camera statement. The undivided loyalty necessary for effective assistance of counsel is missing

where counsel must slight the defense of one defendant to protect another. *See Sanchez v. Nelson,* 446 F.2d 849 (9th Cir. 1971). Mr. Harris knew Ms. Perry could be impeached by her prior conviction. Thus, even if the prior felony conviction prevented her from testifying, if this choice damaged Mr. James, then conflict is apparent.

Finally, Ms. Perry was charged with only one of the pharmacy robberies, Herbison's Pharmacy. However, she was implicated by testimony at trial in the robbery of the Manito Pharmacy, although only Mr. James was charged in that crime. Even though the trial court sustained Mr. Harris' objection to further testimony of an eyewitness who identified Ms. Perry as the female suspect in that crime, much of the testimony was already in, and more followed. The physical similarity and similar modus operandi of the male and female perpetrators in the Manito and Herbison robberies were prejudicial to Ms. Perry. The joint representation of Mr. James and Ms. Perry likely added to this prejudice. We hold that Ms. Perry's failure to testify, and the joint trial with evidence implicating Ms. Perry in an uncharged crime, presumptively denied both defendants a fair trial, based on an actual conflict of interest.

Accordingly, we reverse and remand for a new trial.

McINTURFF, C.J., and GREEN, J., concur.

Reconsideration denied August 24, 1987.