IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32722-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ALEXANDER JOSEPH COMO, JR., | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Alexander Como, Jr., appeals his conviction for rape of

a child in the second degree.  The evidence supporting Mr. Como's conviction includes

testimony from the child victim and his own confession.  We analyze whether his

confession was voluntary under well-established constitutional principles and whether to

review an unpreserved legal financial obligation (LFO) challenge.  Additionally, we

analyze the various issues raised by Mr. Como in his statement of additional grounds for

review (SAG).  We determine that there was no error and affirm.

FACTS

The State charged Mr. Como with rape of a child in the second degree. The information alleged "on or between October 31, 2012 and December 15, 2012, [Mr. Como] did engage in sexual intercourse with and was at least thirty six months older than Jane Doe (D.O.B.: 02/25/99), a person who was at least twelve years of age but less than fourteen years of age . . . ." Clerk's Papers (CP) at 1. A jury found Mr. Como guilty of rape of a child in the second degree on May 22, 2014.

Prior to the filing of the information, Mr. Como voluntarily came to the police station in February 2013 to speak with Detective Marcus Goodwater regarding an inappropriate sexual relationship involving a minor and another man. However, between Halloween 2012 and December 2012 Mr. Como had been involved in a sexual relationship with the same minor. Although Detective Goodwater suspected a sexual relationship had occurred between Mr. Como and the minor, during the course of the interview Mr. Como was advised that he was not in custody. The interview lasted under one hour and, at one point, Mr. Como told Detective Goodwater that he woke up at five that morning. During the interview Detective Goodwater employed a ruse, claiming that a piece of the minor's clothing appeared to be stained with what could be Mr. Como's deoxyribonucleic acid (DNA). After the ruse, Mr. Como confessed.

2

In a pretrial CrR 3.5 hearing, Mr. Como challenged the voluntariness of his

confession based on Detective Goodwater's ruse. At the hearing, the State questioned

Detective Goodwater:

> Q. Okay. Did you make any promises to Mr. Como during the course of your interview about how the case would be handled, or any sort of positive consequences to him if he spoke with you?
> A. No.

Report of Proceedings (RP) at 11. Defense counsel cross-examined the detective
on this point:

> Q. Okay. And did Mr. Como then indicate to you that if he did have DNA that matched with him he was afraid that he would get into a lot of trouble, do you recall him saying that?
> A. I do.
> Q. Do you recall you responding that you were not interested in getting anyone in trouble?
> A. Something to that affect [sic].

RP at 16. At the close of the CrR 3.5 hearing, the trial court made the following findings

of fact:

> The detective asked the defendant about his own relationship with the victim. At first the defendant demurred, but, when asked if DNA testing would reveal the defendant did have sexual intercourse with the victim, the defendant admitted to a sexual relationship with the victim, encompassing a number of instances of sexual intercourse and touching, over several months.

CP at 3-4. Consequently, the trial court concluded "[t]he defendant's statements were

made freely and voluntarily, and should be admitted under CrR 3.5." CP at 4.

During the trial, defense counsel did not specifically renew a challenge to the admissibility of the confession, but did cross-examine Detective Goodwater concerning the confession. While being cross-examined, Detective Goodwater testified as follows:

> Q. . . . You had referred to [C.J.] as a beautiful woman, correct?
> A. I believe so.
> Q. You really wanted to emphasize that you understood that they had a romantic relationship, that it was a consensual dating relationship; would that be fair to say?
> A. Yes, it would.
> Q. You also made the point of telling him that you weren't interested in getting him into trouble, correct?
> A. I believe I stated something along that.

RP at 79-80.

Mr. Como did not testify at trial, but the minor testified to the sexual relationship between herself and Mr. Como. The jury found Mr. Como guilty.

After the trial but before sentencing, multiple letters were sent to the trial court either by Mr. Como or on his behalf. On May 29, 2014 (seven days after being found guilty), Mr. Como wrote:

> I would like to request a new attorney and a new trial. I do not feel that my attorney represented me well. None of my witnesses were called, and [my attorney] did not present verifiable evidence that would have cleared me of these charges. . . . As a matter-of-fact, I am quite certain that [my attorney] was convinced that I was guilty, without even hearing my side. [My attorney] also probably should not have represented me due to the fact that, many years ago, he judged against me in a trial where I "supposedly" was dealing marijuana.

4

CP at 24. On June 22, 2014, Mr. Como wrote: "I had many witnesses and many facts that I wanted brought to court, but [my attorney] said none of them would help." CP at 26. Voicing the same complaints, on July 30, 2014, Mr. Como wrote:

> [My attorney] refused to believe me, and also refused to call my witnesses, two of whom were present in court. He was the Judge in a case that I was involved in, in College Place, around 2007. This led to his being convinced of my guilt, and poor representation. He repeatedly attempted to convince me that my testimony in court was damning, and that my witnesses could not help me.

CP at 52. The July 30, 2014, letter further states that Mr. Como's witnesses "are submitting written statements." CP at 52.

The only additional witnesses mentioned in the record are Abby Achziger and Rodney Marquette. Prior to sentencing, Mr. Marquette sent a letter to the trial court stating: "Alex is my friend so I will support him. However I do not condone the things he has done." CP at 54. At the sentencing hearing, Mr. Marquette testified: "Alex isn't the type of person that is going to go out and do this again." RP at 147. In the same vein, Ms. Achziger testified that Mr. Como "made a very terrible mistake." RP at 146.

At sentencing, the trial court imposed $3,178.65 in mandatory and discretionary LFOs. The judgment and sentence contains the following boilerplate language:

2.5 ABILITY TO PAY LEGAL FINANCIAL OBLIGATIONS.
(RCW 9.94A.760) The court has considered the defendant's past, present
and future ability to pay legal financial obligations, including the
defendant's financial resources and the likelihood that the defendant's
status will change. The court specifically finds that the defendant has the
ability or likely future ability to pay the legal financial obligations ordered
herein.

CP at 60. Mr. Como was ordered to pay his LFOs at the rate of $50 per month.

During the sentencing hearing, the trial judge noted that he had read the special sex

offender sentencing alternative (SSOSA) report and presentence investigation report.

Notably, the SSOSA report indicates that Mr. Como "well may be capable of academic

and vocational successes beyond his past level of attainment." CP at 34. The reports also

indicate that Mr. Como has previously worked at Taco Bell and Macy's. Further, if

released on SSOSA, Mr. Como may have been able to find work through his father's girl

friend, who "owns an orchard and likely would have odd chores, which he might be able

to physically handle." CP at 32. In the same vein, the presentence investigation states

that Mr. Como enjoys writing "and has considered doing so for a living, publishing under

a pseudonym." CP at 46.

At the same time, the reports indicate that at the time of sentencing Mr. Como "has

been pursuing permanent disability benefits through the local Community Service Office

and [the Department of Social and Health Services] for rather implausible medical

6

limitations." CP at 35. Further, the trial judge signed an order of indigency for Mr.

Como's appeal as "issues with [his] hands or wrists" might prevent him from working.

RP at 153. After going through what LFOs were being imposed, the trial judge stated:

> I understand that Mr. Como has some physical issues. Really haven't explored those in any great detail. We will make—obviously, these legal financial obligations are subject to later review. And in terms of his ability to pay at the time he is going to be required to pay.

RP at 149.

Mr. Como timely appealed.

## ANALYSIS

1.   *Whether the trial court erred in admitting Mr. Como's confession*

If the admissibility of a confession is challenged based on voluntariness, the trial

court conducts a CrR 3.5 hearing. If a confession is deemed admissible after a CrR 3.5

hearing, the weight of the confession is then a matter for the jury. *See* CrR 3.5(d). On

review, this court "look[s] to the findings of fact and conclusions of law entered after the

CrR 3.5 hearing." *State v. Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158 (2012).

Findings of fact entered following a CrR 3.5 hearing will be verities on appeal if

unchallenged, and, if challenged, they are verities if supported by substantial evidence in

the record. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). "'Substantial

evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of

7

the finding.'" *State v. Solomon*, 114 Wn. App. 781, 789, 60 P.3d 1215 (2002) (quoting *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)). Further, this court "review[s] de novo whether the trial court derived proper conclusions of law from its findings of fact." *Pierce*, 169 Wn. App. at 544.

Mr. Como cites *State v. Brousseau*, 172 Wn.2d 331, 259 P.3d 209 (2011), claiming "appellate courts examine the entire record that was before the trial court." Br. of Appellant at 13 n.3. However, *Brousseau* is based on considerations not present for determining the voluntariness of a confession. Specifically, *Brousseau* states that in reviewing the trial judge's competency determination of an infant witness, the appellate court "may examine the entire record." *Id.* at 340. This is so because "[t]he presumption of competence persists throughout the proceedings but may be challenged at any time." *Id.* at 341. Since competency can fluctuate, "[a] child found competent at one point in time may become incompetent at trial." *Id.* at 348.

Unlike a child's competency as a witness, the voluntariness of a confession cannot fluctuate between the CrR 3.5 hearing and the trial. If the admissibility of a confession is challenged on appeal, any portion of the record from trial relating to the confession goes to the weight of the evidence, not its admissibility. *See* CrR 3.5(d) ("if the defense raises

8

the issue of voluntariness . . . the jury shall be instructed[1] that they may give such weight and credibility to the confession in view of the surrounding circumstances, as they see fit"). Therefore, this court only considers "the findings of fact and conclusions of law entered after the CrR 3.5 hearing." *Pierce*, 169 Wn. App. at 544.

The voluntariness of a confession is analyzed under the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008) ("The protection provided by the state provision is coextensive with that provided by the Fifth Amendment."). The test for determining the voluntariness of a confession is "whether in light of the totality of the circumstances, the defendant's will was overborne." *Id.* at 112. Under this approach, "both the conduct of law enforcement officers in exerting pressure on the defendant to confess and the defendant's ability to resist the pressure are important." *Id.* at 101.

Factors relevant under the totality of the circumstances test include: "the 'crucial element of police coercion'; the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation." *Id.* at 101 (quoting *Withrow v. Williams*, 507 U.S. 680,

---

[1] Neither the State nor Mr. Como requested such jury instruction.

9

693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)). "A promise made by law enforcement does not render a confession involuntary per se, but is instead one factor to be considered in deciding whether a confession was voluntary." *Id.* However, in order to apply the totality of the circumstances test to an implied promise, "[w]hether any promise had been made must be determined" as a prerequisite. *Id.*

The totality of the circumstances factors are used to determine whether there was "a direct causal relationship between the promise [or other coercive techniques] and the confession." *Id.* at 102. In determining the causal relationship, "the key is whether the promise made it impossible for the defendant to make a rational choice as to whether to confess." *Id.* at 108.

> A police officer's psychological ploys, such as playing on the suspect's sympathies, saying that honesty is the best policy for a person hoping for leniency, or telling the suspect that he could help himself by cooperating may play a part in a suspect's decision to confess, "but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary."

*Id.* at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)). A suspect's "failure to realize the possible consequences of giving the statement does not change its voluntary nature." *State v. Curtiss*, 161 Wn. App. 673, 691, 250 P.3d 496 (2011).

The Supreme Court of Washington has stated that while it "do[es] not condone deception, that alone does not make a confession inadmissible as a matter of law." *State*

10

*v. Braun*, 82 Wn.2d 157, 161, 509 P.2d 742 (1973). Consequently, misrepresentation of DNA evidence also does not make a confession involuntary. *State v. Burkins*, 94 Wn. App. 677, 695-96, 973 P.2d 15 (1999) (additionally courts "have held confessions to be voluntary when police falsely told a suspect that his polygraph examination showed gross deceptive patterns, when police told a suspect that a co-suspect named him as the triggerman, and when police concealed the fact that the victim had died").

Here, Mr. Como argues that his confession was involuntary as it was elicited by an "implied promise" that "'You won't get in trouble for having sex with this beautiful woman as long as it was consensual.'" Br. of Appellant at 13. However, it is unclear from the record whether Detective Goodwater's statements were an "implied promise." *See Unga*, 165 Wn.2d at 101-02 ("Whether any promise has been made must be determined and, if one was made, the court must then apply the totality-of-the-circumstances test."). All the record reveals is that Mr. Como voluntarily came to speak with Detective Goodwater, was advised that he was not in custody, told Detective Goodwater that he had woke up around 5:00 a.m., built a conversational rapport with Detective Goodwater, and eventually confessed when Detective Goodwater bluffed that the police may have DNA evidence that could implicate Mr. Como.

11

Following the CrR 3.5 hearing, the trial court concluded that Mr. Como's confession should be admitted as it was made freely and voluntarily. The trial judge's findings of fact are supported by substantial evidence in the record. Under *Burkins*, the trial judge's conclusions of law are correct as claiming to have DNA evidence does not overbear a defendant's will under the totality of the circumstances approach. *Burkins*, 94 Wn. App. at 695-96. Even if we could consider Detective Goodwater's trial testimony, and it was in fact an "implied promise," Mr. Como's will was not overborne and his confession was a product of his own balancing of competing considerations. Mr. Como's failure to realize the possible consequences of giving the statement does not change its voluntary nature. We hold that the trial court did not err in admitting Mr. Como's confession.

2. *Whether this court should exercise its discretion to review an unpreserved LFO claim of error and, if so, whether the trial court's finding that Mr. Como has the ability to pay $3,178.65 in LFOs at a rate of $50 per month is clearly erroneous*

Whenever a person is convicted, the trial court "may order the payment of a legal financial obligation" as part of the sentence. RCW 9.94A.760(1); *accord* RCW 10.01.160(1). However, "a trial court has a statutory obligation to make an individualized inquiry into a defendant's current and future ability to pay before the court imposes LFOs." *State v. Blazina*, 182 Wn.2d 827, 830, 344 P.3d 680 (2015); *accord*

12

RCW 10.01.160(3) ("[T]he court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.").

Importantly, "the court must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry." *Blazina*, 182 Wn.2d at 838. This inquiry requires the court to "consider important factors . . . such as incarceration and a defendant's other debts, including restitution, when determining a defendant's ability to pay." *Id.* Therefore, "[t]he record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay." *Id.*[2] However, neither RCW 10.01.160 nor the Washington Constitution "'requires a trial court to enter formal, specific findings regarding a defendant's ability to pay [discretionary] court costs.'" *State v. Lundy*, 176 Wn. App. 96, 105, 308 P.3d 755 (2013) (alteration in original) (quoting *State v. Curry*, 118 Wn.2d 911, 916, 829 P.2d 166 (1992)).

---

[2] Although courts have little guidance at to what counts as an "individualized inquiry," *Blazina* makes clear, at a minimum, the sentencing court "must also consider important factors . . . such as incarceration and a defendant's other debts, including restitution, when determining a defendant's ability to pay." *Blazina*, 182 Wn.2d at 838. In the absence of a presentence report discussing these subjects, a sentencing court might inquire from the prosecutor the opportunity an able-bodied prisoner has to earn money, and the typical monthly pay for such prisoners who choose to work.

"The trial court's determination 'as to the defendant's resources and ability to pay is essentially factual and should be reviewed under the clearly erroneous standard.'" *State v. Bertrand*, 165 Wn. App. 393, 404 n.13, 267 P.3d 511 (2011) (quoting *State v. Baldwin*, 63 Wn. App. 303, 312, 818 P.2d 1116 (1991)). "'A finding of fact is clearly erroneous when, although there is some evidence to support it, review of all of the evidence leads to a definite and firm conviction that a mistake has been committed.'" *Lundy*, 176 Wn. App. at 105 (internal quotation marks omitted) (quoting *Schryvers v. Coulee Cmty. Hosp.*, 138 Wn. App. 648, 654, 158 P.3d 113 (2007)).

"A defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically entitled to review." *Blazina*, 182 Wn.2d at 832. Subject to three exceptions, RAP 2.5(a) provides that an "appellate court may refuse to review any claim of error which was not raised in the trial court." In *Blazina*, the Washington Supreme Court recently confirmed that an appellate court's discretion under RAP 2.5(a) extends to review of a trial court's imposition of discretionary LFOs. *Blazina*, 182 Wn.2d at 830. The *Blazina* court noted "[n]ational and local cries for reform of broken LFO systems demand that this court exercise its RAP 2.5(a) discretion and reach the merits of this case." *Blazina*, 182 Wn.2d at 835.

Here, the trial court imposed both mandatory and discretionary LFOs. The $500

14

victim assessment, $100 DNA collection fee, and $200 criminal filing fee are required irrespective of Mr. Como's ability to pay. *See Lundy*, 176 Wn. App. at 102. However, the $1,200.00 SSOSA evaluation, $775.00 court-appointed attorney fees, $250.00 jury demand fee, $129.17 sheriff fees, and $24.48 for witness fees are all discretionary LFOs. *See Lundy*, 176 Wn. App. at 103-04; *see also State v. Young*, 125 Wn.2d 688, 697, 888 P.2d 142 (1995) ("the decision to order the expenditure of public funds for the requisite [SSOSA] evaluation is . . . within the trial court's discretion"). The discretionary LFOs equal almost $2,000.

Under *Blazina*, this court has the discretion to decline review of Mr. Como's LFOs. *Blazina*, 182 Wn.2d at 832. Admittedly, the judges of this court are not in agreement to what extent discretion should be exercised to review unpreserved LFOs. An approach favored by the author is to consider the administrative burden and expense of bringing a defendant to court for a new hearing, versus the likelihood that the discretionary LFO result will change.

In reviewing the sentencing record, we note the trial court's statement that it had "read [the doctor's SSOSA] psychological report [and] reviewed the Presentence Investigation and recommendation." RP at 147. The reports refer to Mr. Como's past employment history and possible vocational success after Mr. Como is released from

15

custody. During sentencing the trial judge stated that he had not explored Mr. Como's physical issues "in any great detail." RP at 149. However, the reports the trial court reviewed refer to Mr. Como's possible medical conditions as "rather implausible." CP at 35. Further, as Mr. Como's past employment was in the service industry, his alleged medical conditions do not necessarily impact his ability to find work. *See Lundy*, 176 Wn. App. at 108 ("a showing of indigence is [the defendant's] burden"). Given this record, and the trial court's decision to allow LFO payments to be made at $50 per month, a new sentencing hearing is unlikely to change the LFO result. We decline to review Mr. Como's unpreserved LFO challenge.

*SAG ISSUE I: Whether the charging document, alleging that the crime(s) were committed "on or between October 31, 2012 and December 15, 2012," is unconstitutionally vague*

"Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, a charging document must include all essential elements of a crime to inform a defendant of the charges against him and to allow preparation for the defense." *State v. Kiliona-Garramone*, 166 Wn. App. 16, 22, 267 P.3d 426 (2011); *see* CrR 2.1(a)(1). However, "[a] charging document is constitutionally sufficient if the information states each statutory element of the crime,

16

even if it is vague as to some other matter significant to the defense." *Kiliona-Garramone*, 166 Wn. App. at 22.

This court reviews allegations of constitutional violations de novo. *State v. Zillyette*, 178 Wn.2d 153, 158, 307 P.3d 712 (2013) (quoting *State v. Siers*, 174 Wn.2d 269, 273-74, 274 P.3d 358 (2012)). "When a defendant challenges the sufficiency of a charging document for the first time on appeal, an appellate court will liberally construe the language of the charging document in favor of validity." *Id.* at 161. "Liberal interpretation 'balances the defendant's right to notice against the risk of . . . "sandbagging"—that is, that a defendant might keep quiet about defects in the information only to challenge them after the State has rested and can no longer amend it.'" *Id.* at 161-62 (quoting *State v. Nonog*, 169 Wn.2d 220, 227, 237 P.3d 250 (2010)).

In liberally construing the charging document, we employ the two-pronged *Kjorsvik* test: (1) do the necessary elements appear in any form, or by fair construction, on the face of the document and, if so, (2) can the defendant show he or she was actually prejudiced by the inartful language. *State v. Kjorsvik*, 117 Wn.2d 93, 105-06, 812 P.2d 86 (1991); *Zillyette*, 178 Wn.2d at 162. "'An "essential element is one whose specification is necessary to establish the very illegality of the behavior" charged.'" *Zillyette*, 178 Wn.2d at 158 (quoting *State v. Ward*, 148 Wn.2d 803, 811, 64 P.3d 640

17

(2003)). However, "[g]reat specificity is not required, only sufficient facts for each element." *State v. Lindsey*, 177 Wn. App. 233, 246, 311 P.3d 61 (2013), *review denied*, 180 Wn.2d 1022, 328 P.3d 903 (2014).

When a charging document regarding sexual abuse informs of the nature and cause of the accusations against a defendant, it is not necessary for the State to give the exact dates for each alleged offense. *See State v. Carver*, 37 Wn. App. 122, 126, 678 P.2d 842 (1984) ("The State need not fix a precise time for the commission of the offense when it cannot intelligently do so."); *see also State v. Cozza*, 71 Wn. App. 252, 257, 858 P.2d 270 (1993) ("When a child has an inability to recall the time of sexual contact with the defendant, the defendant should not escape prosecution, whether there were multiple events or only a single event."). "Washington case law has approved 1- to 3-month time frames when sexual charges are brought and the victims are young and unable to establish calendar dates." *Id.* at 260 n.4.

Here, the information alleges that "on or between October 31, 2012 and December 15, 2012, [Mr. Como] did engage in sexual intercourse with and was at least thirty six months older than Jane Doe (D.O.B.: 02/25/99), a person who was at least twelve years of age but less than fourteen years of age." CP at 1. Where the sexual relationship with the minor was ongoing over the course of several months, the State

18

cannot intelligently allege specific dates if the minor cannot recall specific dates. *See*

*Carver*, 37 Wn. App. at 126. Further, because the defense strategy was to challenge the

voluntariness of Mr. Como's confession, he could not be prejudiced by any lack of

specific dates in the information. Consequently, the information against Mr. Como was

sufficient to afford him notice of the nature and cause of the accusations to allow him to

prepare a defense.

> *SAG ISSUE II: Whether Mr. Como's Sixth Amendment right to conflict-free
> representation was violated by his public defender previously having served as a judge in
> a municipal court matter involving Mr. Como*

The Sixth Amendment to the United States Constitution guarantees a criminal

defendant's right to effective assistance of counsel, and "includes the entitlement to

representation that is free from conflicts of interest." *State v. Regan*, 143 Wn. App. 419,

425, 177 P.3d 783 (2008). "Defense counsel has a duty of loyalty to the defendant, and

thus the right to effective assistance of counsel includes the right to conflict-free

counsel." *In re Pers. Restraint of Gomez*, 180 Wn.2d 337, 348, 325 P.3d 142 (2014).

"The trial court has a duty to investigate potential attorney-client conflicts of interest if it

knows or reasonably should know that a potential conflict exists." *Regan*, 143 Wn. App.

at 425-26. "But if the defendant does not make a timely objection in the trial court, a

conviction will stand unless the defendant can show that his lawyer had an actual conflict that adversely affected the lawyer's performance." *Id.* at 426.

This court reviews whether circumstances demonstrate a conflict of interest de novo. *Id.* at 428. This court "'will not find an actual conflict unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interest.'" *State v. James*, 48 Wn. App. 353, 366, 739 P.2d 1161 (1987) (internal quotation marks omitted) (quoting *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir. 1983)).

"An 'actual conflict' is 'a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.'" *Regan*, 143 Wn. App. at 427-28 (internal quotation marks omitted) (quoting *Mickens v. Taylor*, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)). "Possible or theoretical conflicts of interest are 'insufficient to impugn a criminal conviction.'" *Gomez*, 180 Wn.2d at 349 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)). "'[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.'" *State v. Dhaliwal*, 150 Wn.2d 559, 573, 79 P.3d 432 (2003) (alteration in original) (quoting *Cuyler*, 446 U.S. at 350).

20

Here, Mr. Como did not timely object in the record regarding a potential conflict of interest involving his trial counsel. The only portion of the record referring to even a possibility of a conflict of interest is when Mr. Como sent letters to the trial judge *after* being found guilty at trial. Mr. Como's letters allege that his public defender had a conflict as the public defender had previously served as a judge in a matter involving Mr. Como. Even if these letters could be considered an objection, such objection was not timely as the trial had already occurred. *See State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988) ("The appellate courts will not sanction a party's failure to point out at trial an error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial."). Moreover, the situation described by Mr. Como in his letters would not have led any reasonable trial judge to suspect a potential conflict of interest. *See State v. Davis*, 141 Wn.2d 798, 862, 10 P.3d 977 (2000) (trial court should not have reasonably suspected a conflict of interest when the "lawyers never raised any concern about a possible conflict of interest," the defendant did not "claim at any time during trial that his legal representation was tainted by conflict of interest," and the trial court "properly relied upon the judgment of Appellant's own lawyers and had no reason to believe there was a conflict of interest").

21

Mr. Como's assertions[3] do not show a conflict of interest because if his defense counsel had previously presided as a judge in a case involving Mr. Como, the matters would have been wholly unrelated. *See* RPC 1.7(a). Even if an actual conflict of interest had been established, the record reveals that Mr. Como's defense counsel zealously advocated on his behalf. Mr. Como's defense counsel challenged the admissibility of Mr. Como's confession, vigorously cross-examined the State's witnesses, and moved to dismiss the case at the conclusion of evidence. Therefore, Mr. Como's Sixth Amendment guarantee of conflict-free representation was not violated as he cannot show that his public defender actively represented conflicting interests or his performance was affected.

*SAG ISSUE III: Whether Mr. Como received ineffective assistance of counsel*

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-85, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of counsel, a defendant must prove (1) defense counsel's representation was deficient, i.e., it was below an objective standard of reasonableness under the circumstances, and (2) the deficient representation prejudiced him, i.e., a reasonable

---

[3] Mr. Como attached appendixes to his SAG, but under RAP 10.3(a)(8) this court does not review appendix material not contained in the record. The appropriate means of raising such matters is through the filing of a personal restraint petition. *State v.*

probability exists the outcome would have been different without the deficient representation. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

"A claim of ineffective assistance of counsel presents a mixed question of fact and law, reviewed de novo." *State v. Brown*, 159 Wn. App. 366, 370, 245 P.3d 776 (2011). "When an ineffective assistance claim is raised on appeal, the reviewing court may consider only facts within the record." *State v. Grier*, 171 Wn.2d 17, 29, 246 P.3d 1260 (2011). "While off-the-record conversations between [a defendant] and her attorney may be germane to her ineffective assistance claim, [a defendant] must file a personal restraint petition if she intends to rely on evidence outside of the trial record." *Id.*

"There is a strong presumption that trial counsel's performance was adequate, and exceptional deference must be given when evaluating counsel's strategic decisions." *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009). Decisions relating to contacting, interviewing, and subpoenaing witnesses are tactical trial decisions. *See State v. We*, 138 Wn. App. 716, 728, 158 P.3d 1238 (2007). Further, "'when the facts that support a certain potential line of defense are generally known to counsel because of what the

---

*McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

23

defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.'" *Gomez*, 180 Wn.2d at 355 (quoting *Strickland*, 466 U.S. at 691).

Mr. Como argues defense counsel did not call certain witnesses who would have been helpful to his case. However, the testimony of Mr. Como's proposed witnesses is not in the record. The appropriate means of raising such matters is through the filing of a personal restraint petition. *McFarland*, 127 Wn.2d at 335. Decisions on whether a witness should be interviewed or should testify are tactical trial decisions of defense counsel. The additional witnesses who spoke at Mr. Como's sentencing spoke to the fact that Mr. Como "isn't the type of person that is going to go out and do this again" and "made a very terrible mistake." RP at 146-47. It is not ineffective assistance of counsel merely because Mr. Como would have called these witnesses at his trial.

Affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Siddoway, C.J.

Korsmo, J.

24