

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE **JUN 0 8 2017**

~~Fairhurst. CJ.~~

CHIEF JUSTICE

This opinion was filed for record

at **8:00 am** on **June 8, 2017**

Susan L. Carlson

**SUSAN L. CARLSON**
**SUPREME COURT CLERK**

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | | |
|---|---|---|---|
| STATE OF WASHINGTON, | ) | | |
| | ) | | |
| Petitioner, | ) | No. 93143-7 | |
| | ) | | |
| v. | ) | En Banc | |
| | ) | | |
| KEVIN LEE ESTES, | ) | | |
| | ) | Filed    **JUN 0 8 2017** | |
| Respondent. | ) | | |
| | ) | | |

OWENS, J. — After an altercation where he cut someone's foot and pinky finger, Kevin Estes was convicted of felony harassment and third degree assault. The jury returned deadly weapon verdicts for both convictions, elevating both offenses to third "strikes" under Washington's three strikes law, the Persistent Offender Accountability Act (POAA). RCW 9.94A.030. The State then reminded the court that "this is a third strike case," to which Estes's attorney responded, "He wasn't convicted of a strike offense." 4 Verbatim Tr. of Proceedings (VTP) (Sept. 12, 2014) at 504. The prosecutor explained that Estes's convictions counted as strikes because

of the deadly weapon enhancements. Estes was then sentenced to the mandatory minimum of life in prison.

Estes appealed, alleging ineffective assistance of counsel. *See* U.S. CONST. amend. VI; CONST. art. I, § 22. He claimed his trial counsel did not know that he would be sentenced as a persistent offender if the jury convicted him of any felony with a deadly weapon enhancement. The Court of Appeals ordered a new trial, holding that counsel was ineffective because he did not understand the strike offense consequences and thus could not fully inform Estes of his options during the plea bargaining process. We agree and affirm the Court of Appeals.

## FACTS

On February 19, 2014, Kevin Estes went over to his friend James Randle's apartment in Puyallup. Randle's roommate, Anthony Prusek, was also in the apartment that evening, along with Prusek's girlfriend, Ashley Stoltenberg.

Estes drank alcohol and played video games with Randle and Prusek while Stoltenberg watched television in another room. Estes soon began making comments about Stoltenberg's breasts, asking Prusek for a nude photo. Having overheard this exchange, an angry Stoltenberg came out of the bedroom and told Estes, "'If you do not stop talking about me like that, I am going to slap you.'" 2 VTP (Sept. 8, 2014) at 84.

According to Stoltenberg, Estes then stood up aggressively and said, "'Time to die, bitch'" while taking a knife out of his pocket. *Id.* at 86. Prusek grabbed Estes, and the two men struggled. Estes began "flailing around" with the knife, and Prusek's foot and pinky finger were cut while the men wrestled. *Id.* at 133.

Stoltenberg left the room and called 911. Meanwhile, Randle took the knife from Estes and put it on top of the refrigerator. Randle told Estes to leave because the police were coming, and Estes complied.

A responding officer, Officer Greg Massey, found Estes sitting in his car in the driveway. After an "angry and agitated" Estes opened the car door and told the officer that there had been a fight, the officer searched Estes and found a knife in his pocket. *Id.* at 209. Estes told the officer that this was not the knife from the incident. Nevertheless, Massey confiscated the knife and took it into evidence.

Another officer, Officer Steve Pigman, responded later in the evening and entered the apartment. He noticed a different knife on top of the refrigerator, and Stoltenberg told him that it was the knife used in the incident. That knife was not taken into evidence.

The State charged Estes with second degree assault against Prusek, second degree assault against Stoltenberg, and felony harassment against Stoltenberg, with deadly weapon enhancements added to each count. Because Estes had previously been convicted of two strike offenses under RCW 9.94A.030, the State filed a

persistent offender notice warning that if the jury found Estes guilty of second degree

assault, felony harassment, or any other most serious offense, he would be sentenced

to life without the possibility of parole. The persistent offender notice did not provide

any information about the impact of the deadly weapon enhancements.

During a discussion of jury instructions, defense counsel objected to an

instruction on the lesser included offense of third degree assault and proposed

instructions on fourth degree assault and self-defense. He did not object to the court's

instructions on the deadly weapon enhancements or to the deadly weapon special

verdict form for the felony harassment charge.

At closing arguments, the State argued that both the knife found on Estes's

person and the one on top of the refrigerator were "deadly weapon[s]" because of their

blade length or capacity to cause death. 4 VTP (Sept. 10, 2014) at 444-46, 453-54.

Defense counsel argued that due to inconsistent accounts from witnesses, the State

could not meet its burden of proving an assault occurred. He argued that the knife

that was introduced into evidence was not the knife used in the incident, noting that

witnesses remembered that the knife was "long and big and whatever," but that they

knew nothing more about it. *Id.* at 468-69.

The jury acquitted Estes of both second degree assault charges, but found Estes

guilty of one count of third degree assault (a lesser included offense) and felony

harassment. They returned deadly weapon verdicts for both crimes, elevating them to strike offenses.[1]

After the jury returned its verdicts and was excused, the following exchange took place:

> [PROSECUTOR]: . . . As the Court is aware, this is a third strike case. There's no issue as to — as to —
>
> [DEFENSE COUNSEL]: He wasn't convicted of a strike offense.
>
> [PROSECUTOR]: Apparently, the Defendant is a third strike case because of the deadly weapon enhancements, so there's no issue as to the sentencing.

*Id.* (Sept. 12, 2014) at 504.

Defense counsel then moved to dismiss the deadly weapon verdicts, arguing that they were inconsistent with the acquittals on second degree assault. He noted that "[t]he jury was not asked to make a determination of the weapon's length nor were they asked to determine whether the knife was *per se* a deadly weapon," and also argued that the sentences were disproportionate. Clerk's Papers (CP) at 340. The trial court denied the motion.

Constrained by the POAA, the trial court sentenced Estes to total confinement for life without the possibility of release. The trial judge stated at the close of

---

[1] Second degree assault is a strike in and of itself. By contrast, third degree assault and felony harassment count as strikes only when coupled with a deadly weapon verdict, as they were here. RCW 9.94A.030(33)(b), (t).

5

sentencing, "I will just say that . . . this is not the kind of strike that we typically would be looking for as a community to be a third strike." 4 VTP (Nov. 7, 2014) at 534.

Estes appealed, alleging ineffective assistance of counsel. The Court of Appeals reversed Estes's convictions, holding that defense counsel was ineffective because he did not understand the strike offense consequences and thus could not fully inform Estes of his options during the plea bargaining process. *State v. Estes*, 193 Wn. App. 479, 494, 372 P.3d 163 (2016). Judge Maxa dissented, stating that the record was inconclusive as to what Estes's attorney did or did not know. *Id.* at 495.

The State petitioned for review, which was granted. *State v. Estes*, 186 Wn.2d 1016, 380 P.3d 522 (2016).

## ISSUES

1.     Was Estes's trial counsel prejudicially ineffective?

2.     Did the Court of Appeals rely on facts outside the record when it found ineffective assistance of counsel?

## ANALYSIS

The State argues that Estes cannot show that his attorney's performance was deficient and that even if it was, he failed to show he suffered any prejudice resulting from deficient performance. Relatedly, the State also contends that the Court of

Appeals relied on facts outside of the record when it found ineffective assistance of counsel. We disagree, affirm the Court of Appeals, and remand for a new trial.

A. *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. *See* U.S. CONST. amend. VI; CONST. art. I, § 22. We review ineffective assistance of counsel claims de novo. *State v. Jones*, 183 Wn.2d 327, 338-39, 352 P.3d 776 (2015).

Washington has adopted *Strickland v. Washington*'s two-pronged test for evaluating whether a defendant had constitutionally sufficient representation. 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Cienfuegos*, 144 Wn.2d 222, 226, 25 P.3d 1011 (2001). Under *Strickland*, the defendant must show both (1) deficient performance and (2) resulting prejudice to prevail on an ineffective assistance claim. *Strickland*, 466 U.S. at 687; *Jones*, 183 Wn.2d at 339.

Performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice exists if there is a reasonable probability that "but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009); *Strickland*, 466 U.S. at 694. The defendant must affirmatively

prove prejudice and show more than a "'conceivable effect on the outcome'" to prevail. *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006) (quoting *Strickland*, 466 U.S. at 693). At the same time, a "reasonable probability" is lower than a preponderance standard. *Strickland*, 466 U.S. at 694; *Jones*, 183 Wn.2d at 339. Rather, it is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

Washington courts also indulge a strong presumption that counsel's representation was reasonable. *Kyllo*, 166 Wn.2d at 862. Performance is not deficient if counsel's conduct can be characterized as legitimate trial strategy or tactics. *Id.* at 863.

Finally, the *Strickland* court warned against mechanical application of these guidelines. It reminded that "a court should keep in mind that the principles we have stated do not establish mechanical rules. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. Thus, we consider not just *Strickland*'s basic test, but also this guiding principle in our analysis.

B. *The POAA and Third Strikes*

Estes's ineffective assistance claim hinges on whether or not his trial counsel knew that deadly weapons enhancements would elevate Estes's convictions to third

strikes. Thus, a bit of background into relevant portions of the POAA is necessary to provide context.

Under the POAA, trial courts are required to sentence "'persistent offenders'" to life in prison without the possibility of parole. *Crawford*, 159 Wn.2d at 89-90; RCW 9.94A.570. A "persistent offender" is one who has been convicted of any felony considered a "most serious offense" under RCW 9.94A.030(38)(a)(i) and who has twice been previously convicted of such offenses or equivalent offenses in other states. The definition includes a list of specific felonies, but also includes "[a]ny other felony with a deadly weapon verdict." RCW 9.94A.030(33)(t). The statute defines a "deadly weapon" as "an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death." RCW 9.94A.825. Any knife with a blade longer than three inches is a deadly weapon. *Id.*; *State v. Thompson*, 88 Wn.2d 546, 548, 564 P.2d 323 (1977).

For purposes of evaluating defense counsel's performance, it is also important to know that second degree assault, with which Estes was charged but not convicted, also involves the term "deadly weapon." A person is guilty of second degree assault if, among other things, he or she "[a]ssaults another with a deadly weapon." RCW 9A.36.021(1)(c). Thus, the term "deadly weapon" is relevant not just for the

applicability of deadly weapon enhancements, but also as the basis for establishing the elements of second degree assault (a strike in and of itself).

1. *Defense Counsel's Performance Was Deficient: the Record Demonstrates That He Was Unaware That the Deadly Weapon Enhancements Converted Estes's Convictions into Strike Offenses*

First, we consider the first *Strickland* prong: whether defense counsel's performance was deficient. We must, therefore, evaluate whether his conduct was reasonable considering all the circumstances. *Strickland,* 466 U.S. at 688. The State first contends that Estes cannot show his attorney's performance was deficient, primarily arguing it is not clear from the record that counsel was unaware that Estes was convicted of a strike offense. We disagree. As explained below, the record clearly demonstrates that defense counsel was unaware that his client was convicted of a strike offense. He was thus unable to inform Estes of a key matter in the case.

The duty to provide effective assistance includes the duty to research relevant statutes. *In re Pers. Restraint of Yung-Cheng Tsai,* 183 Wn.2d 91, 102, 351 P.3d 138 (2015) (counsel has a duty to advise on immigration consequences for a noncitizen defendant). Failing to conduct research falls below an objective standard of reasonableness where the matter is at the heart of the case. *Kyllo,* 166 Wn.2d at 868. For example, in *Crawford,* we found deficient performance when defense counsel knew that her client had an extensive criminal record but failed to conduct additional research to ascertain whether her client was at risk of a third strike. 159 Wn.2d at 91,

10

99. And in *State v. Aho*, we found deficient performance where reasonably adequate research would have prevented the possibility of conviction based on acts predating the relevant statute's effective date. 137 Wn.2d 736, 745-46, 975 P.2d 512 (1999).

Similarly, defense counsel's failure to investigate the impact of deadly weapon enhancements under the POAA was objectively unreasonable here. While counsel was aware of Estes's criminal history and the fact that he had already been convicted of two strike offenses under the POAA, the record shows that he was unaware that Estes's convictions converted to strike offenses when coupled with deadly weapon verdicts. Counsel stated that he was unaware that his client was convicted of a strike offense, repeatedly acquiesced to characterizations of both knives as "deadly weapons," and argued against the enhancements posttrial only after he became aware of his mistake. We review each of these facts in turn.

First, defense counsel's statement at the close of trial is direct evidence that he was unaware of the impact of the deadly weapon enhancements. After the jury returned its verdicts and immediately after the prosecutor informed the trial court that "this is a third strike case," defense counsel stated that he believed Estes was not convicted of a strike offense. 4 VTP (Sept. 12, 2014) at 504. We should take him at his word: he was not aware that Estes had been convicted of a third strike.

The State argues that this "single, offhand remark" is not enough to demonstrate deficient performance, suggesting that counsel "may have been

11

momentarily confused or simply misspoke." Suppl. Br. of Pet'r at 15. We disagree. Attorneys may be momentarily confused about many things: the proper page number of a citation, the name of a case cited in a brief, the age of a party. Momentary confusion about an essential point of law—whether or not a client was convicted of a third strike—is far less likely. We have found deficient performance when counsel later admitted that she was unaware of a key matter in the case. *See Crawford*, 159 Wn.2d at 92, 99 (attorney testified posttrial that she had not investigated defendant's out-of-state conviction because she assumed it had been a misdemeanor). We find no differently here, where counsel admitted as such—albeit inadvertently—at the close of trial.

To support its argument that Estes's attorney may have known about the significance of the enhancements, the State also points out that the record reveals multiple instances where counsel attempted to exclude evidence relating to the knife. These attempts show that counsel likely understood the significance of excluding the knife for purposes of avoiding a conviction for second degree assault (a strike in and of itself), as the jury instructions stated that a person commits second degree assault when he "assaults another with a deadly weapon." CP at 301; RCW 9A.36.021(1)(c). However, it is clear that counsel did not understand the significance of the deadly weapon *enhancements*, in particular their ability to elevate a usually "nonstrike" charge to a strike offense.

12

Defense counsel often acquiesced to the characterizations of the knives as deadly weapons. For example, he objected when the State moved to admit the knife that Officer Massey took from Estes's person, but appeared to not have a problem with that knife being admitted for "deadly weapon purposes," stating that "I agree that they can argue that he was armed with a deadly weapon during the assault, that's the deadly weapon, that's fine. As long as they can't say that that's not the knife that was used in the assault." 2 VTP (Sept. 8, 2014) at 204. He also failed to object to other witness characterizations of the knife as "deadly," "sharp," "capable of causing serious bodily injury," and capable of causing "[v]ery, very, very, very grave harm." 3 VTP (Sept. 9, 2014) at 270; 2 VTP (Sept. 8, 2014) at 87, 134.

These choices might be characterized as trial strategy except for the fact that counsel *did* begin to vigorously fight the deadly weapon enhancements posttrial, *after* the prosecutor pointed out that the enhancements elevated Estes's convictions to strike offenses. Posttrial, defense counsel moved to dismiss the enhancements due to insufficient evidence, conflicting verdicts, the length of the blade, and a disproportionate sentence. He explained that when he measured the actual "blade" with a ruler, it did not measure more than three inches and, therefore, did not meet the definition of a "per se deadly weapon." He argued that the jury had never been asked to make a determination of the weapon's length or determine whether the knife was a per se deadly weapon. There is no tactical explanation for why these arguments were

13

not brought up at any point during the trial, especially when these distinctions could mean the difference between a life sentence and a shorter one.

A defendant can overcome the presumption of effective representation by demonstrating "that counsel failed to conduct appropriate investigations." *State v. Thomas*, 109 Wn.2d 222, 230, 743 P.2d 816 (1987) (citing *State v. Jury*, 19 Wn. App. 256, 263, 576 P.2d 1302 (1978)). Estes has done so here. Counsel's statement that "[Estes] wasn't convicted of a strike offense" coupled with other evidence from the record demonstrates that he was unaware of the impact of the deadly weapon enhancements. 4 VTP (Nov. 7, 2014) at 504. This failure to familiarize himself with a key aspect of the POAA was objectively unreasonable, especially in light of the fact that Estes was facing a third strike. As such, we find deficient performance.

### 2. *Estes Was Prejudiced When He Was Deprived of the Ability To Make an Informed Decision about Whether To Plead Guilty*

Establishing deficient performance is not the end of our analysis. Estes must also show that counsel's poor performance was prejudicial. The State argues that Estes was not prejudiced at trial, noting that at least some of counsel's arguments "were effective in convincing the jury not to convict [Estes] of the more serious offenses." Suppl. Br. of Pet'r at 12. We agree: counsel's performance at trial is not, in and of itself, enough to demonstrate prejudice. But the right to effective assistance of counsel applies to more than just the trial itself.

14

The United States Supreme Court has recently held that the right to effective assistance of counsel applies in the plea bargaining context. *Lafler v. Cooper*, 566 U.S. 156, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012); *see also Missouri v. Frye*, 566 U.S. 133, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012). In *Lafler*, the Court held that a defendant was prejudiced by trial counsel's deficient performance in advising him to reject a plea offer and go to trial. The majority opined, "Even if the trial itself is free from constitutional flaw, the defendant who goes to trial instead of taking a more favorable plea may be prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence." *Lafler*, 566 U.S. at 166. Similarly, in another case, the Court held that the failure to advise a client of the risk of deportation in pleading guilty constitutes deficient performance, given that the justices had "long recognized that deportation is a particularly severe 'penalty.'" *Padilla v. Kentucky*, 559 U.S. 356, 365, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010) (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 740, 13 S. Ct. 1016, 37 L. Ed. 905 (1893)); *see also Yung-Cheng Tsai*, 183 Wn.2d at 102.

This court, too, has recognized a right to effective assistance in plea bargaining, stating that effective assistance includes "assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial." *State v. A.N.J.*, 168 Wn.2d 91, 111, 225 P.3d 956 (2010). Counsel must, at a minimum, "reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case

proceeds to trial so that the defendant can make a meaningful decision as to whether or not to plead guilty." *Id.* at 111-12; *see also State v. Edwards*, 171 Wn. App. 379, 394, 294 P.3d 708 (2012). Uncertainty about the outcome of plea bargain negotiations should not prevent reversal where confidence in the outcome is undermined. *State v. James*, 48 Wn. App. 353, 363, 739 P.2d 1161 (1987); *Strickland*, 466 U.S. at 694.

However, in *Crawford*, we addressed an issue involving a third strike conviction but found that the defendant did not prove prejudice. 159 Wn.2d at 89-90. There, a defendant was sentenced to life in prison without the possibility of parole under the POAA. At a posttrial hearing, his trial attorney admitted that she had not investigated one of Crawford's out-of-state convictions because she assumed it had been a misdemeanor. *Id.* at 92. We found that counsel's failure to investigate Crawford's prior convictions was deficient under the first *Strickland* prong. *Id.* at 98-99. However, a five-justice majority of this court found no prejudice, concluding that Crawford had not demonstrated that but for counsel's error, he would have avoided sentencing under the POAA. The majority noted that (1) Crawford presented no evidence that the prosecutor would have allowed him to plead guilty to a lesser offense and (2) there was a lack of mitigation evidence in the record. *Id.* at 100-02. The dissent urged that the majority misapplied the *Strickland* standard in concluding that Crawford had not established prejudice, stating, "[W]e need not be certain the

errors of counsel determined the outcome. . . . [I]nstead, a mere reasonable probability of a different outcome is all that is required." *Id.* at 104.

This case is distinguishable from *Crawford*. In *Crawford*, the record contained no evidence that the prosecutor would have been willing to allow him to plead guilty to a lesser offense. Here, however, at the close of sentencing, the prosecutor stated as follows:

> [O]ur office has a policy on third strike cases where the defense . . . has an opportunity to seek mitigation . . . [and ask] for something other than a third strike resolution. The Defendant, Mr. Estes, declined to enter into any negotiations whatsoever during the entire course of this case. Also he did not wish to avail himself of the mitigation process.

4 VTP (Nov. 7, 2014) at 534. Thus, the State indicated its willingness to work with Estes to reach a different outcome, but Estes apparently refused to negotiate.[2] Had Estes come forward, the State may have been willing to negotiate "something other than a third strike resolution." *Id.*

The State counters that "[t]his case was not one in which the State appeared eager to reduce his charges in any meaningful way and [was] not required to do so." Suppl. Br. of Pet'r at 18. This focus on the prosecutor's actions, rather than Estes's, is misplaced here. Estes did not attempt to negotiate, and thus we cannot speculate about the specifics of what the State may or may not have offered him. What we *do*

---

[2] During the pendency of his case, Estes filed several motions and documents with the court. CP at 35-144. In one such document, he wrote, "I would stipulate to a [misdemeanor] drunk and disorderly or the equivalent that precludes county probation, fine, and or alcohol assessment. . . . If not it's time for trial, no more b.s. continuances." *Id.* at 86.

17

know is that lacking knowledge about a key matter in his case, Estes declined to negotiate from the outset.

That being said, the State is correct that the record does not show with complete certainty that had Estes known about the impact of the deadly weapon enhancements, he would have been able to negotiate a different outcome. But we need not be 100 percent sure that the outcome would have been different to find prejudice here: the *Strickland* Court clarified that a defendant need not even make his showing on a more-likely-than-not basis. 466 U.S. at 693. Here, it is reasonably probable that had Estes known that there was a much higher chance that he would be spending life in prison, the result of the proceeding would have differed.

Defense counsel did not research the implications of the deadly weapon enhancements, and thus he was unable to communicate crucial information to his client. There is a reasonable probability that had Estes been fully informed, he would have negotiated a different outcome. Estes was denied the ability to "mak[e] an informed decision" about whether to plead guilty, and we find that defense counsel's conduct prejudiced Estes. *A.N.J.*, 168 Wn.2d at 111.

### 3. *The Court of Appeals Did Not Rely on Facts outside the Record, and a Direct Appeal Is a Proper Remedy Here*

After his convictions, Estes filed a statement of additional grounds (SAG) in which he wrote, "[My defense attorney] did not advise me that the weapon enhancement was a strike in its self [sic] or when attached to a[n] Assualt [sic] 3 or

felony harassment." SAG at 2. Pointing to this assertion, the State argues that the Court of Appeals impermissibly considered facts outside the record when it determined that Estes's attorney was ineffective. The State also suggests that rather than file a direct appeal, Estes should file a personal restraint petition in order to develop a record about what defense counsel knew or did not know. We disagree.

When an ineffective assistance claim is raised on appeal, this court may consider only facts contained in the record. *McFarland*, 127 Wn.2d at 335. Any off-the-record conversations between Estes and his attorney must be raised in a personal restraint petition. *State v. Grier*, 171 Wn.2d 17, 29, 246 P.3d 1260 (2011).

There is no evidence that the Court of Appeals relied on facts outside the record in this case. In actuality, the Court of Appeals explicitly declined to take Estes's statement at face value, stating, "[I]nsofar as [Estes's] assertion implicates matters outside the record, we do not consider it. A personal restraint petition is the proper vehicle for such an issue." *Estes*, 193 Wn. App. at 488 n.6. The Court of Appeals went on to base its decision solely on the record itself, citing to the State's persistent offender notice, defense counsel's statements during and after trial, and other facts entirely within the record. *See id.* at 490-91.

The Court of Appeals did not rely on facts outside the record to reach its decision, nor do we. The existing record on appeal clearly demonstrates that Estes's attorney did not know about the significance of the deadly weapon enhancements.

Since he was unaware of a key point of law, there was no way that he could have communicated that information to his client. We need not look to facts outside the record to make these inferences.[3]

Relatedly, the State argues that the correct remedy in this case would be for Estes to file a personal restraint petition, after which a reference hearing might be appropriate in order to develop what counsel knew or did not know. We disagree. To reiterate, the record is clear: defense counsel himself stated that he was unaware that his client was convicted of a third strike. This statement is supported by the rest of the record. A reference hearing is not necessary.

## CONCLUSION

We believe that a defendant facing a third strike should be able to know the nature and potential consequences of the charges before him in order to make an informed decision about whether to plead guilty. The record indicates that here, this was not the case. Trial counsel's deficient performance created a reasonable probability that the outcome of the case would have been different but for this performance. Thus, we affirm and remand for a new trial.

---

[3] It is conceivable that Estes might have known about the impact of the deadly weapon enhancements (without being advised as such by his attorney), but there is no reason for us to assume so.

WE CONCUR:

_Fairhurst, C.J._

_Johnson, J._

_Madsen, J._

_Stephens, J._

_Yu, J._

No. 93143-7

GONZÁLEZ, J. (concurring)—Kevin Estes was convicted of third degree assault and felony harassment while armed with a deadly weapon after he scuffled with a friend over lewd comments he said about the friend's girlfriend's body. Because of that deadly weapon finding, Estes was sentenced to life imprisonment without possible release.

I agree with the majority that Estes's convictions should be reversed and retried because he received ineffective assistance of counsel. *See* U.S. CONST. amend. VI; CONST. art. I, § 22. More specifically, I agree that Estes's trial counsel was deficient because he was unaware a felony conviction with a deadly weapon enhancement qualified as a strike offense under Washington's three strikes law, RCW 9.94A.570. RCW 9.94A.030(38), 33(t). I also agree counsel's failure to recognize the substantial penalties attached to that deadly weapon enhancement probably affected the way counsel presented the case to the jury and the outcome of this case. I write separately because I disagree with the majority about how

that failure prejudiced Estes.

Unlike the majority, I am unconvinced Estes would have sought a plea deal had defense counsel informed him he would be sentenced to life imprisonment without possible release if the jury found he committed a felony while armed with a deadly weapon. There is ample evidence that Estes knew he would be sentenced to life imprisonment without possible release if the jury convicted him of any one of the two crimes with which he was charged: second degree assault or felony harassment with a deadly weapon.[1] Despite knowing he could be sentenced to life in prison and knowing the State was willing to negotiate a lesser charge, Estes refused to engage in any plea negotiations. 4 Verbatim Tr. of Proceedings (VTP) (Nov. 21, 2014) at 534. The majority fails to explain why knowing he could receive that same sentence for the lesser included offense of third degree assault with a deadly weapon would have altered Estes's steadfast position throughout the pendency of his case that he would only accept a "drastic[al]ly reduced plea" akin to drunk and disorderly conduct with "time

---

[1] Clerk's Papers at 381 (persistent offender notice (third conviction) informing Estes that he is being charged as a persistent offender), 85 (letter from Estes reminding the State that "in essence you've tried to take my life" through filing these charges), 96 (pretrial forensic mental health report confirming Estes "correctly identified [he could receive] the statutory maximum sentence of 'life' in prison given his criminal history (i.e., 'third strike felony')"); 1 Verbatim Tr. of Proceedings (VTP) (Aug. 25, 2014) at 3, 31-32, 50 (State and defense counsel describing the case as a third strike case during pretrial motions in Estes's presence).

2

*State v. Estes (Kevin Lee)*, No. 93143-7 (González, J., concurring)

served." Clerk's Papers (CP) at 104.[2]

While it is *possible* that this additional knowledge could have altered

Estes's no-negotiation position and therefore the outcome of this case, it is

not *reasonably probable*. To prevail on an ineffective assistance of counsel

claim, the "defendant must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would

have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.

Ct. 2052, 80 L. Ed. 2d 674 (1984). "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.*

In my view, it is more likely—and indeed reasonably probable—that

had defense counsel known a deadly weapon finding would elevate a simple

felony to a strike offense, he would have argued during trial against that

finding much like he did posttrial when he realized its significance. *See* 4

VTP (Nov. 7, 2014) at 509-25. There is also a reasonable probability that

had defense counsel so argued, the jury would have decided this case

---

[2] Estes sent numerous letters to the trial court expressing his belief that the charges against him should be dismissed because they were without legal merit. Twice, however, he mentioned a willingness to accept a misdemeanor plea so he could be released from pretrial custody and reunited with his family. CP at 86 ("I would stipulate to a [misdemeanor] [d]runk and disorderly or the equivalent that precludes County probation, fine, and or alcohol assessment . . . [with] credit for time served [and] no more. . . . If not it's time for trial, no more b.s. continuances."), 104 ("[I]f [the court] support[s] the [State's] probable [cause assessment,] allow me a bail and order a negotiation/arbitration on a drastic[al]ly reduced plea of [d]isorderly conduct. I believe a c-class [misdemeanor] with credit for time served.").

3

differently.

At trial, the jury was asked to decide two questions regarding deadly weapons: Did Estes "assault[ ] another with a deadly weapon" under RCW 9A.36.021(1)(c), and did he commit assault or felony harassment while armed with a "deadly weapon" under RCW 9.94A.825? The first question relates to his second degree assault charge. The second question relates to the deadly weapon sentence enhancement.

What qualifies as a deadly weapon differs under each question. A "deadly weapon" for purposes of second degree assault means "any . . . weapon, device, [or] instrument . . . which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). In contrast, a "deadly weapon" for purposes of the sentence enhancement means an "instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death," which expressly includes "any knife having a blade longer than three inches." RCW 9.94A.825.

The jury found Estes did not assault anyone with a deadly weapon capable of causing death or substantial bodily injury and therefore acquitted him of second degree assault, *see* CP at 331, 333, but the jury did find he

4

committed third degree assault, CP at 332, while armed with a deadly weapon either capable of inflicting death or having a blade longer than three inches to qualify for the sentence enhancement, *see* CP at 338.

Because the jury did not specify, we cannot know with certainty which of the two knives Estes had with him during the assault formed the predicate for the jury's deadly weapon finding. Was it the knife he used during the assault that grazed his friend's foot and pinky finger, or was it the switchblade pocketknife law enforcement officers found in his pocket when they arrested him?

Based on the jury's acquittal of Estes's second degree assault charge, it is unlikely the jury predicated the deadly weapon finding on the knife used during the assault. To conclude otherwise would require us to believe the jury found the knife was either capable of inflicting death or had a blade longer than three inches even though the jury found Estes did not commit assault with a knife capable of inflicting death or substantial bodily harm and even though that knife was never produced at trial. Although the friend testified at first that the blade of the knife was about three and a half to four inches long, the friend later qualified that testimony, explaining he did not get a "good look" at the knife because it was "moving around pretty fast." 2 VTP (Sept. 8, 2014) at 134, 186. One officer testified that while he saw the

knife, he did not know how long the blade was, though he believed the entire knife was approximately six inches long. 3 VTP (Sept. 9, 2014) at 256-57; 269-70. It is doubtful the jury could find beyond a reasonable doubt based on the friend's and officer's testimony that the blade of the knife used during the assault was longer than three inches.

Instead, it is more likely the jury predicated its deadly weapon finding on the pocketknife the officers found in Estes's pocket when they arrested him since that knife was produced at trial. Because Estes did not use the pocketknife in the assault, the jury could not have concluded the knife was capable of producing death based on "the manner in which it was used." RCW 9.94A.825. Rather, the jury probably found the pocketknife was a deadly weapon because it had "a blade longer than three inches." *Id.* Estes, however, disagrees with that measurement.

According to Estes, the blade of the pocketknife was only three inches, not *longer* than three inches. CP at 342. Even the State's forensic expert, who measured the blade, agreed the blade was either "right at three inches" or "maybe just a little, eighth inch shy, maybe really close to three inches." 2 VTP (Sept. 8, 2014) at 217. But the expert also testified the blade was "over three inches" and "almost three and quarter" inches. *Id.* at 218. Despite the importance of the blade's measurement and the expert's

6

*State v. Estes (Kevin Lee)*, No. 93143-7 (González, J., concurring)

contradictory testimony, defense counsel never asked the expert to clarify this critical fact at trial. *Id.* at 218-19. Counsel's failure to cross-examine the State's expert regarding this measurement reasonably affected the outcome of Estes's case.

Because defense counsel did not realize the deadly weapon enhancement would elevate a felony conviction to a strike offense, defense counsel did not challenge the State's assertion that the blade was over three inches long. Had counsel so argued, there is a reasonable probability the jury would not have entered that deadly weapon finding given their other findings. For this reason, I concur. Estes's defense counsel was ineffective, and his convictions should be reversed.

González, J.

McCloud, J.

Madsen, J.