FILED
4/13/2020
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of: | DIVISION ONE |
| LARRY D. DALEY JR., | No. 76925-1-I |
| Petitioner. | UNPUBLISHED OPINION |

DWYER, J. — After his conviction on four counts of assault in the first degree and two counts of unlawful possession of a firearm in the first degree, Larry Daley filed this personal restraint petition. He avers that insufficient evidence supported his assault convictions, that he received ineffective assistance of counsel at sundry occasions during trial, and that the trial court abused its discretion by imposing consecutive sentences for his assault convictions and firearm enhancements in lieu of exceptional concurrent sentences for both. His assertions of ineffective assistance do not merit appellate relief. Because his claim of insufficient evidence was already litigated, and because his sentencing claim is untimely, we will not consider them.

Accordingly, we deny the petition.

Citations and pin cites are based on the Westlaw online version of the cited material.

I

A

Daley's convictions were affirmed on direct appeal. The underlying facts giving rise to his trial and conviction are set forth in that opinion, State v. Daley, No. 71956-4-I (Wash. Ct. App. Dec. 28, 2015) (unpublished), http://www.courts.wa.gov/opinions/pdf/719564.pdf. Therein, we stated:

> Early on November 25, 2012, Seattle Police Department detectives Benjamin Hughey, Jonathan Huber, and Thomas Janes responded to a request for assistance at the now defunct Citrus nightclub on Fairview Avenue. Fights had broken out during the evening and a large crowd had gathered outside as the club was closing. The detectives arrived in a single car and parked opposite the nightclub on the far side of Fairview Avenue.
>
> They saw a group of three to five men walking along Fairview Avenue following a man in a white hooded sweatshirt. The man in the sweatshirt was later identified as the defendant, Larry Daley Jr. Daley and the group of men appeared to be having a heated argument. Daley stepped into the street and began to cross Fairview Avenue. The group followed him into the street, where they exchanged gestures and yelled back and forth.
>
> The detectives saw Daley suddenly turn back toward his pursuers and reach toward his waistband with his right hand. He then drew out his arm, elbow raised, in a motion that the detectives immediately recognized as drawing a firearm. Daley extended his hand and leveled a nine millimeter semiautomatic pistol directly at the group of men. He was only about ten feet from the men when he fired multiple shots directly at them, with a crowd of club patrons behind them. Detective Hughey testified that he "only remember[ed] one distinct round." Verbatim Report of Proceedings (VRP) (3/20/14) at 61. One of the Citrus employees heard three to six rounds being fired toward the club. A security guard heard "a spurt of four or five shots." VRP (3/27/14) at 68. The group of men scattered and were never identified. The crowd erupted into chaos—yelling and screaming, with drivers "peeling out" in their cars to get away. VRP (3/27/14) at 140-41.
>
> As the detectives got out of the vehicle, Janes shouted, "Stop, Police!" while Hughey ran to intercept Daley. VRP (3/20/14)

at 67-68. Daley looked in the direction of the detectives, but then turned back and fired additional shots at the fleeing men and the crowd. He then sprinted toward the detectives. As the distance between Daley and Hughey closed to approximately twenty yards, Daley raised his gun and pointed it directly at Hughey. In that moment, Hughey believed that Daley was about to shoot him. Hughey raised his own service weapon and sighted Daley, firing twice as Daley veered past him onto Yale Avenue—running above and behind the detectives' position.

Daley then had the high ground on Yale Avenue, in position to present a deadly threat to the detectives. Hughey ran over to the retaining wall and spotted Daley, still in possession of his weapon, through some rhododendrons. Hughey fired additional shots at Daley as he continued to run up Yale Avenue. Meanwhile, Huber and Janes had come around the vehicle to get a better angle on Daley. As Daley crossed their line of sight on the opposite side of the rhododendrons, Huber saw Daley turn and point his gun directly toward him and Janes. Huber immediately felt that his life was in danger and fired several shots at Daley.

In that same moment, as Huber fired at Daley, Janes saw two amber muzzle flashes coming from Yale Avenue, between the rhododendron bushes that lined the street. Janes actually felt and heard the bullets pass by his head, recalling the distinctive pop and whiz sound caused by the projectiles breaking the sound barrier. Janes thought that either he or Huber was going to die and yelled for Huber to take cover.

Meanwhile, Hughey ran to the back of the parking lot to access a ramp leading up to Yale Avenue. When he reached the ramp, he did not see Daley at first until he turned his weapon mounted flashlight on the rhododendron bushes. He saw Daley in the bushes and heard him call out, "I'm shot, I'm dying." VRP (3/20/14) at 89. Hughey yelled at him to keep his hands up, then called out to Huber and Janes that he had the suspect.

Huber ran to provide cover, while Hughey ordered Daley out of the bushes. Daley no longer had his gun and indicated that he had left it in the bushes. Hughey found the gun where Daley had indicated. Forensic investigators recovered several spent nine millimeter shell casings from the area near Fairview Avenue, three of which matched Daley's pistol. Also recovered under the rhododendron bush where Daley was arrested were two matching casings.

Detectives Hughey and Janes later viewed security footage from cameras on the Fred Hutchinson campus. The footage, played at trial, showed Daley running across Fairview Avenue and up Yale Avenue, as Hughey fired at him. Exhibit 2, Camera 072 at 1:56:48 a.m.—1:57:07 a.m. At 1:57:11 a.m., the video showed a muzzle flash from Daley's location. Exhibit 2, Camera 081 at 1:57:11 a.m.; Appendix E (Screen shot of muzzle flash). The video then shows Daley running and crouching in the bushes along the side of the research center. Exhibit 2, Camera 072 at 1:57:12 a.m.—1 a.m. At 1:57:22 a.m., the video shows Daley firing a final shot from the bushes at Hughey—in the top right corner of the frame. Exhibit 2, Camera 072 at 1:57:22 a.m.; see also Appendix F (Screen shot of final muzzle flash—Shot fired at Hughey).

The State charged Daley with four counts of assault in the first degree, while armed with a firearm. In count one, the State alleged that Daley, with intent to inflict great bodily harm, did assault "John Doe" with a firearm and force and means likely to produce great bodily harm or death. Clerk's Papers (CP) at 12. The State made the same allegation as to the three Seattle Police Department detectives in counts two through four.

Daley waived his right to a jury trial. The trial court found Daley guilty of all four counts of first degree assault and imposed a standard range sentence.

Daley, No. 71956-4-I, slip op. at 2-5 (footnote omitted).

Because first degree assault is a serious violent offense, the statutory presumption was that Daley would serve four sentences for those convictions consecutively. RCW 9.94A.589(1)(b). Daley requested an exceptional sentence of concurrent terms, arguing that consecutive sentences would be clearly excessive. While the State agreed that the trial court had discretion to impose concurrent sentences, it requested consecutive sentences and urged that Daley's firearm enhancements be imposed consecutively.

The trial court agreed with the State that firearm enhancements were required to be served consecutively. The court also declined Daley's request for

4

exceptional concurrent sentences on the assault convictions, stating that "[t]here simply is nothing that can be characterized as mitigation in the case." Thus, the trial court imposed a 320-month sentence for the assault against "John Doe," and consecutive sentences of 153 months for the assaults against each of the three detectives. In total, the court imposed on Daley a term of 779 months of confinement.

Daley then appealed his conviction for assault against "John Doe" on the basis that the State failed to prove each element of the crime beyond a reasonable doubt, violated his right to a unanimous verdict, and violated the constitutional prohibition on double jeopardy. He appealed his convictions for assault against each police officer on the basis of insufficient evidence. We affirmed on all grounds. Daley, No. 71956-4-I, slip op. at 1.

B

On May 31, 2017, Daley filed this personal restraint petition, alleging that his attorney, Leanne Lucas, was ineffective in several discrete instances during trial and asserting a new argument of insufficient evidence. On November 3, 2017, Daley moved to add an additional ground for relief to his petition. We granted the motion. In his supplemental brief, Daley alleged that his sentence violates the Eighth Amendment, and that he is entitled to resentencing because the trial court did not take his youth into consideration as a mitigating factor justifying exceptional concurrent sentences and concurrent firearm enhancements.

5

Daley's petition was stayed pending the Supreme Court's decision in In Re Pers. Restraint of Light-Roth, 191 Wn.2d 328, 422 P.3d 444 (2018). On December 6, 2018, the stay was lifted and we transferred the matter to the King County Superior Court, directing that court "to determine what statements, if any, Daley's attorney made to Daley regarding the potential racial makeup of a jury and Daley's chances of an acquittal in front of such a jury."

This reference hearing took place on March 18, 2019. On April 15, 2019, the superior court entered its findings of fact. It found that:

> 1. Ms. Lucas predicted to Mr. Daley and to his family members that most or all potential jurors would be white.
>
> 2. Ms. Lucas used the phrase, "white union workers," when discussing the racial makeup of the potential jury panel with Mr. Daley and his family members.
>
> 3. There is insufficient evidence for the court to find that Ms. Lucas used the specific term, "hang," when discussing the jury-trial-waiver issue with Mr. Daley or with his family members.
>
> 4. Ms. Lucas advised Mr. [Daley] that: (a) if the case proceeded to trial before a jury, there would be no guaranty of an acquittal, and there would be a risk that he would be convicted; and (b) likewise, if the case proceeded to a bench trial, there would be no guaranty of an acquittal, and there would be a risk that he would be convicted.
>
> 5. Ms. Lucas recommended to Mr. Daley that he should waive his right to a jury trial and that he should choose a bench trial.
>
> 6. To the extent indicated in Findings of Fact 1-5, above, the court finds the testimony of Mr. Daley and his family members to be more credible than the testimony of Ms. Lucas. It is not unreasonable or surprising that Ms. Lucas would have an incomplete or inaccurate recollection about what she said to Mr. Daley and to his family members regarding the racial makeup of potential jurors, whether a jury might convict or acquit Mr. Daley, and whether he should choose a jury trial or a bench trial. Her

comments and her recommendation were very important, but they were immensely more important to Mr. Daley and to his family members than they were to anyone else. Thus, it is much more likely that Mr. Daley and his family members would focus upon and remember Ms. Lucas' comments and her recommendation more accurately than Ms. Lucas would.

7. Ms. Lucas did not advise Mr. Daley that he had no choice but to waive his right to a jury trial and proceed with a bench trial.

8. Ms. Lucas did not otherwise knowingly attempt to coerce Mr. Daley to choose a bench trial or to waive his right to a jury trial.

9. To the extent that any other witnesses presented testimony, either orally or in writing, that is contrary to Findings of Fact 7 and 8, above, the court finds the testimony of Ms. Lucas to be more credible than the testimony of the other witnesses with respect to those Findings.

We now address the merits of Daley's petition.

I

Daley first avers that the trial court "abused its discretion in heavily relying on video footage" to convict him. He frames this as a due process violation. On closer reading, it is readily apparent that this argument is, in fact, a collateral attack on the sufficiency of the evidence adduced at trial. Because he has already litigated this issue, he may not do so again.

A personal restraint petition is not a means by which to relitigate issues already adjudicated on the petitioner's direct appeal. In re Pers. Restraint of Pirtle, 136 Wn.2d 467, 491, 965 P.2d 593 (1998). A mere revision of a legal argument that has been previously rejected creates neither a new claim nor good cause to reconsider the original claim. In re Pers. Restraint of Jeffries, 114 Wn.2d 485, 488, 789 P.2d 731 (1990). Nor may a petitioner create a novel

7

ground for relief simply by alleging different facts, asserting different legal theories, or phrasing the argument differently. Pirtle, 136 Wn.2d at 491.

Therefore, a personal restraint petitioner is barred from renewing an issue already raised and rejected on direct appeal unless the interests of justice require the relitigation thereof. In re Pers. Restraint of Yates, 177 Wn.2d 1, 17, 296 P.3d 872 (2013). Only when a showing of "an intervening change in the law 'or some other justification for having failed to raise a crucial point or argument in the prior application'" is made can a petitioner argue that reconsideration serves the interests of justice. Yates, 177 Wn.2d at 17 (internal quotation marks omitted) (quoting In re Pers. Restraint of Stenson, 142 Wn.2d 710, 720, 16 P.3d 1 (2001)). To support "'a previous ground for relief with different factual allegations or with different legal arguments'" is insufficient. Yates, 177 Wn.2d at 17 (quoting In re Pers. Restraint of Davis, 152 Wn.2d 647, 671, 101 P.3d 1 (2004)).

Reviewing Daley's case on direct appeal, we rejected Daley's claim that the evidence was insufficient to support his assault convictions:

> Daley argues that the State failed to prove that he was the shooter because no one saw him fire his gun after he ran across Fairview Avenue North, and that neither detective testified that they actually saw Daley pull the trigger. There is more than enough circumstantial evidence in the record, however, for a reasonable fact finder to find that Daley shot at all three detectives that night.
>
> Janes testified that he was heading toward Hughey's location at the loading dock ramp when he saw two amber flashes coming [in] his direction. VRP (3/27/14) 76. He explained that visible amber is "a fire from when a shell is expelled out of a weapon, you get the flameout from the barrel." VRP (3/27/14) at 77. He also testified that he felt the whizzing of two bullets coming past him, and identified the sounds as such based on his prior experience of being fired upon while on a SWAT team. He

8

indicated on a photo that the muzzle flashes were coming from between some rhododendron bushes. Upon review of the security tape showing a flash of light, Janes identified that the light on the tape came from the area where he noticed the two amber flashes. Janes also testified that he was "100 percent" confident that Daley was the person in the white sweatshirt. Id. at 95.

Detective Huber testified that he got out of the car and focused on Daley immediately after he saw him pull out a gun and fire shots at the group. When Daley ran past him, Huber saw Daley "turn and look at [him] and point the gun in [his] direction." Id. at 143. Huber testified that at that point he was "scared and concerned for his own safety." Id. at 144. According to Janes, Huber was also right next to Janes when he saw the amber flashes and heard the bullets whiz past their heads.

Detective Hughey testified that after Daley shot at the group, he began to run toward the officers and saw "his firearm raised and pointed at me." VRP (3/20/14) at 68. Hughey thought at that point he "was going to get shot, possibly killed, so I made the decision to defend my life and I made the decision to shoot at Mr. Daley before he could shoot me." Id. at 71. He further testified that he did not have any independent recollection of Daley shooting at him. Upon viewing the video, it "scared the heck out of [him]," because he "had no memory [himself] of being shot at," but "[w]hen you see the video, you see me getting shot at, which obviously it really—after the fact, it scares you. You're like oh, wow, somebody really did try to kill me." Id. at 111-112.

Daley argues that there is insufficient evidence that he assaulted Janes and Huber, because no bullets or casings were found at or near where Janes saw muzzle flash. He also argues that the security tape showing muzzle flash near him is inconclusive, because you can see only one flash on tape, not two flashes as Detective Janes testified. According to Daley, there is insufficient evidence as well that he assaulted Hughey, because Hughey testified that numerous other people were running on Yale Avenue North and that he was unaware of being fired upon until he viewed the security videotape. The trial court heard all of this evidence and is entitled to deference on issues of credibility and conflicting evidence. We find that there is sufficient evidence in the record to support Daley's convictions and affirm.

Daley, No. 71956-4-I, slip op. at 12-14.

9

Because the claim of insufficient evidence was rejected on direct appeal, Daley is not entitled to litigate it in the present petition, despite his attempt to allege different facts or to assert different legal theories concerning particular evidence. We will not consider his duplicate claim.

III

Next, Daley avers that he received ineffective assistance of counsel in a number of instances during trial. As Daley did not assert that he received such ineffective assistance on direct appeal, he is entitled to argue the question in his personal restraint petition. We address, in turn, each instance in which Daley alleges his trial counsel was ineffective.

A

Our analysis of a claim of ineffective assistance of counsel begins with a strong presumption that counsel was effective. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). The claimant bears the burden of demonstrating that counsel's assistance was ineffective. McFarland, 127 Wn.2d at 337. The claimant must show that (1) counsel's conduct fell below a professional standard of reasonableness and that (2) but for counsel's unprofessional conduct, there is a reasonable probability that the outcome at trial would have been different. State v. Grier, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). If either of these prongs is not met, the claim fails. State v. Garcia, 57 Wn. App. 927, 932, 791 P.2d 244 (1990).

A legitimate tactical decision cannot be the basis of an ineffective assistance claim. State v. Alvarado, 89 Wn. App. 543, 553, 949 P.2d 831 (1998). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. Therefore, we make every effort to "eliminate the distorting effects of hindsight" and evaluate counsel's performance from counsel's perspective at the time. Strickland, 466 U.S. at 689.

Prejudice is not established merely by showing that an error by counsel had *some* conceivable effect on the outcome of the proceeding. Strickland, 466 U.S. at 693. The party claiming ineffective assistance must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694.

B

Daley's principal claim is that his attorney provided constitutionally deficient representation when she advised him to waive his right to a jury trial. We disagree. Daley has not established that his attorney's performance fell below an objective standard of professionalism, nor does he show that he was prejudiced as a result of engaging in a bench trial.[1]

---

[1] Relatedly, Daley claims that his attorney failed to inform him that he could "revoke his waiver of a jury trial at any time." In fact, the trial court has considerable discretion to deny a defendant's request to withdraw a jury waiver. State v. Ashue, 145 Wn. App. 492, 503, 188 P.3d 522 (2008). Daley's attorney did not inform him of a right to revoke his jury waiver at any time because such a right did not exist.

Pursuant to both our state and federal constitutions, a criminal defendant has the right to a jury trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; State v. Castillo-Murcia, 188 Wn. App. 539, 547, 354 P.3d 932 (2015). A waiver of this right is valid if it is knowing, intelligent, and voluntary. State v. Benitez, 175 Wn. App. 116, 128, 302 P.3d 877 (2013). A written waiver "is strong evidence that the defendant validly waived the jury trial right." State v. Pierce, 134 Wn. App. 763, 771, 142 P.3d 610 (2006). Trial counsel's representation to the court that her client's waiver is knowing, intelligent, and voluntary is also evidence of a valid waiver. Benitez, 175 Wn. App. at 128. In assessing a waiver's validity, we also consider whether the trial court informed the defendant of his right to a jury trial. Castillo-Murcia, 188 Wn. App. at 548. An extensive colloquy between the court and the defendant, however, is not a requirement for a waiver to be valid. Benitez, 175 Wn. App. at 128-29.

Daley asserts that his attorney informed him that, should he proceed to a jury trial, the jury's makeup would be predominantly "white union workers" who would be heavily biased against him. After hearing testimony at the reference hearing, the superior court found that Lucas did, indeed, tell Daley that a jury was likely to be all or mostly white, or "white union workers," and that while Daley might be convicted whether he opted for a jury or a bench trial, she advised him to choose the latter. The trial court did not find that Lucas told Daley that a jury trial was certain to produce an unfair verdict, let alone that the hypothetical jurors

12

would "hang" him. It did not find that Daley's attorney coerced him into waiving his right.[2]

While the trial court's findings do not disclose the basis for Lucas's advice, there are several legitimate tactical reasons supported by the record that would, in turn, inform an attorney's decision to advise jury waiver. Among these is the nature of the crime of which Daley was accused and the testimonial evidence that was to be presented against him. Daley was a convicted felon who was charged with four counts of assault and two counts of unlawful possession of a firearm. Because the latter offense was based on his status as a felon, jurors would necessarily be informed that Daley had been convicted of a serious offense. RCW 9.41.040(1)(a). Daley's attorney could reasonably conclude that this knowledge was less likely to have a prejudicial impact on a judge than it would on a jury.

Furthermore, three of the charges of assault alleged that Daley shot at three separate police officers. Several of the State's witnesses were police officers, and it is a conceivable tactical consideration to expect that an experienced trial judge would be less likely than a jury to take the officers' testimony at face value or feel sympathy toward them. This is particularly true in

---

[2] Prior to trial, the trial court did engage in a colloquy with Daley regarding waiver of his right to a jury. The court informed him:

> We bring up, we fill up all those benches in the back of the room with about 50 prospective jurors from Bellevue and Burien and Renton and wherever they come from in King County. We ask them a lot of questions and try to make sure that we have 12 that are fair-minded jurors. . . . They'd have to convince all 12 of those people beyond a reasonable doubt of your guilt. By waiving the jury trial, the case would just be tried to me. I would hear the same evidence. You have all those same rights at trial, but ultimately unanimity is a different matter when you only have one decider versus the 12 deciders.

a situation in which the officers were expected to testify to what was a near-death experience. Detective Hughey testified that simply watching the surveillance video "scared the heck out of [him]," despite having "no memory of being shot at," because "[w]hen you see the video, you see me getting shot at, which obviously it really—after the fact, it scares you. You're like oh, wow, somebody really did try to kill me." Detective Janes testified that the officers "heard the bullets whiz past their heads." The possibility that a judge would be less prone to emotion when hearing this testimony than a group of jurors might be constitutes a legitimate, conceivable tactical reason for Daley's attorney to advise a bench trial.

Daley's attorney also argued at trial that, should the trial court find that Daley did shoot a firearm, the doctrine of transferred intent should not go so far as to support the notion that Daley committed all of the elements of assault as to each officer and as to "John Doe":

> And there's a recognition in other jurisdictions that courts have observed the use of this doctrine where no victim is injured potentially causes a principle of limitless liability. And we suggest to the Court that's what's going on in this case.
>
> Should the State prevail and find Mr. Daley guilty of first degree assault against John Doe, the sky's the limit if you add the officers in and anyone else that was present at that time.

The possibility that this technical legal argument regarding the transferred intent doctrine might register better with a judge than with a jury constitutes another legitimate consideration justifying counsel's conceivable tactical decision.

Finally, as our Supreme Court has recognized:

14

Unlike isolated incidents of juror misbehavior, racial bias is a common and pervasive evil that causes systemic harm to the administration of justice. Also unlike other types of juror misconduct, racial bias is uniquely difficult to identify. Due to social pressures, many who consciously hold racially biased views are unlikely to admit to doing so. Meanwhile, implicit racial bias exists at the unconscious level, where it can influence our decisions without our awareness.

State v. Berhe, 193 Wn.2d 647, 657, 444 P.3d 1172 (2019). Just as with our justices, it is conceivable that Daley's attorney was aware of the possibility of implicit bias among jurors, even when strong effort is made to foreclose such a possibility. A competent trial lawyer could reasonably and conceivably believe that an experienced trial judge would be less prone to the influence of implicit bias than would be a jury. Constitutionally deficient performance has not been established.

Similarly, Daley does not establish prejudice. Again, prejudice in this context requires a showing of a reasonable probability of a different outcome if a jury had heard the case. Strickland, 466 U.S. at 694. Strickland imposes a significant limitation on the assessment of such prejudice.

In assessing prejudice, "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to the law" and must "exclude the possibility of arbitrariness, whimsy, caprice, 'nullification' and the like."

Grier, 171 Wn.2d at 34 (quoting Strickland, 466 U.S. at 694-95). As the Supreme Court explained in Strickland:

A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.

15

466 U.S. at 695. This means that, in assessing potential prejudice, we must assume that a jury would have followed the court's instructions and properly applied the law. Grier, 171 Wn.2d at 43-44. Accordingly, Daley cannot rely on the possibility of jury nullification to argue that the outcome of a jury trial would have been different from that of his bench trial.

In light of the abundant evidence against Daley, he cannot demonstrate that a different outcome would have resulted if his case had been tried to a jury. The police observed Daley, in a white hooded sweatshirt, firing a handgun into a crowd. Shell casings recovered from the location of this shooting were linked to the firearm found near the site of Daley's arrest. The police followed Daley; as Daley ran, he pointed a gun in the direction of the police and then fired several rounds at Detectives Janes and Huber. Video footage from security cameras at several different locations in the vicinity corroborated this and also showed a gunshot coming from the rhododendron bush where Daley was found. Daley was pulled out of the bush, as were a 9-millimeter pistol and two expended cartridges. A search of Daley's vehicle yielded a second firearm which had Daley's fingerprints on it. Given this evidence, Daley does not establish a reasonable probability that a law-abiding jury would have reached different results.

To prevail on his claim of ineffective assistance of counsel, it is Daley's burden to show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. It is also Daley's burden to show that "counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Indeed, unless Daley makes both showings "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687.

Daley fails to make either showing. His ineffective assistance of counsel claim fails.

C

Next, Daley alleges that his attorney was constitutionally ineffective in not objecting to the admission of video and photographic evidence at trial. He claims that the surveillance video, which captured the shooting as it occurred, had no probative value and posed a significant risk of unfair prejudice, and that the photographs, taken at the scene after the crime had occurred, had no relevance.

"Counsel's decisions regarding whether and when to object fall firmly within the category of strategic or tactical decisions." State v. Johnston, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007). To prevail on his claim, Daley must prove a reasonable probability that any objection to the video or photographs would have been sustained. See State v. Nordlund, 113 Wn. App. 171, 179, 53 P.3d 520 (2002) (defendant must show a motion to suppress, if made, would likely have been granted to establish deficient performance or prejudice); McFarland, 127 Wn.2d at 337 n.4 (claim of ineffective assistance for failure to make a particular motion requires an affirmative showing that the motion probably would have been granted).

17

All relevant evidence is admissible except as limited by our state or federal constitutions, state statutes, or court rules.  ER 402.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401.  Evidence that is relevant may nonetheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  ER 403.  We review a trial court's evidentiary rulings for abuse of discretion.  State v. Garcia, 179 Wn.2d 828, 846, 318 P.3d 266 (2014).  A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons.  State v. Dye, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

Here, the video's probative value was clearly high, as it depicted critical aspects of the shooting.  As attested to at trial and noted in our prior opinion, distinct muzzle flashes could be seen, corroborating the testimony of the detectives as to their own location and the shooter's location.  Daley, No. 71956-4-I, slip op. at 3-4.  Daley's argument that the video lacked clarity and "cut out" from time to time goes to the weight the trial court gave this evidence, not to the admissibility thereof.  See State v. Gregory, 158 Wn.2d 759, 835, 147 P.3d 1201 (2006) (challenges to evidence not based on evidence's relevancy go towards weight, not admissibility), overruled on other grounds by State v. W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134 (2014).

The probative value of the photographs, meanwhile, was lessened by the fact that they were taken only after the crime had already occurred.  However,

Daley does not make any argument as to how he was prejudiced by the photographs' admission, instead stating only that "Ms. Lucas did not object, despite the Court asking if she has any objection." Daley follows this with a bare assertion that the State was able to introduce whatever evidence it wished without any fear of objection. This does not answer the question of what damage was done to his case by the photographs' admission. We will not search out such an answer. In re Pers. Restraint of Williams, 111 Wn.2d 353, 364-65, 759 P.2d 436 (1988).

It is readily conceivable that Daley's attorney did not object to the video or photographic evidence because she knew both would be readily admissible with a proper foundation and did not want to highlight them. Withholding an objection that counsel reasonably understands to be unproductive is a legitimate trial tactic. Davis, 152 Wn.2d at 714. Daley has not established any reasonable probability that an objection to the video's, or the photographs', admissibility would have been sustained. His claim of ineffective assistance on this ground fails.

D

Next, we address Daley's claim that his attorney was ineffective when she did not object to "inadmissible speculative testimony" from two of the police detectives who testified at trial. Daley does not articulate any particular testimony that he finds objectionable. It is not our function "to comb the record with a view toward constructing arguments for counsel." In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998). A bare assertion unsupported by

19

references to the record, citations to authority, or persuasive reasoning cannot sustain the petitioner's burden of proof on a claim. State v. Brune, 45 Wn. App. 354, 363, 725 P.2d 454 (1986).

Daley also alleges that his counsel was ineffective in not filing two evidentiary motions: one to suppress the surveillance video, and apparently one to suppress evidence of the handgun that was recovered near his hiding place.[3] Because the video evidence was clearly admissible, and because he cannot show that his attorney was ineffective by virtue of not objecting to its admission, he cannot show that a motion to suppress the video was warranted or would have succeeded, let alone that his attorney was ineffective in not making such a motion. As to the handgun, Daley, again, provides no facts or evidence that might facilitate our review of the claim. Williams, 111 Wn.2d at 365. He does not show that a motion to suppress would have succeeded or affected the outcome of the case. Thus, his claims of ineffective assistance on these grounds fail.[4]

---

[3] Daley's declaration accompanying his personal restraint petition states merely that he "asked [Lucas] to file a motion regarding the handgun that was found in the bushes without any of my DNA or fingerprints on it and she declined to do so or even investigate the matter further."

[4] In a similar vein, Daley alleges that his attorney performed deficiently during the questioning of witnesses, claiming that his attorney did not raise a purported discrepancy between Detective Janes's testimony and the video evidence introduced and that his attorney failed to highlight the testimony of Darren Lenz, a bouncer at Citrus, who stated that the shooter did not resemble Daley. In fact, his attorney argued extensively to the court, during Daley's summation, that Janes's testimony was inconsistent with other evidence before the court *and* that Lenz's testimony cast doubt on whether Daley was the shooter. Thus, Daley does not show that the alleged deficient performance actually took place—let alone establish prejudice stemming therefrom.

E

Next, Daley asserts that his trial counsel was ineffective in negotiating a plea deal and in advising Daley of the benefits either of going to trial or of pleading guilty. Specifically, he claims that his attorney (1) failed to negotiate a fair deal with the State, (2) failed to adequately advise him of the State's plea offer, and (3) failed to advise him of the sentencing consequences of his conviction. Daley does not show that any of these actions constituted deficient performance or that he was prejudiced as a result thereof.

A criminal defendant's right to effective assistance of counsel extends to the plea bargaining process. U.S. CONST. amend. VI; In re Pers. Restraint of Riley, 122 Wn.2d 772, 780, 863 P.2d 554 (1993). In the plea bargaining context, counsel must actually and substantially assist her client in deciding whether to plead guilty. State v. Osborne, 102 Wn.2d 87, 99, 684 P.2d 683 (1984). Defense counsel has a duty to communicate any formal plea offers made by the State. State v. James, 48 Wn. App. 353, 362, 739 P.2d 1161 (1987). In order to show prejudice when a plea offer has been rejected due to counsel's deficient performance, a defendant must demonstrate a reasonable probability that he would have accepted the plea offer had counsel performed effectively and that the State would not have withdrawn the offer. Missouri v. Frye, 566 U.S. 134, 147, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012).

Daley has produced no evidence that his attorney failed to negotiate with the State, failed to properly advise him of a State's plea offer, or failed to properly advise him of the sentencing consequences of a conviction. In fact, the

21

prosecutor stated, on the record, that plea negotiations *had* taken place and that further attempts to negotiate the case were made on the eve of trial.[5] Records of electronic mail correspondence between the State and Daley's attorney corroborate this.

Furthermore, Daley was informed, on the record, of the sentencing consequences of his conviction. When the trial court offered to give Daley more time to discuss the State's plea offer with his attorney, Daley simply refused, stating, "I would like to go forward, Your Honor." Simply put, there is no evidence in the record of the deficient performance of which Daley complains.

Nor is there any evidence of prejudice, because Daley makes no showing that he would have pled guilty but for defense counsel's actions. He offers only a self-serving declaration that he would have done so, but allowing statements such as this, on their own, to establish prejudice would "'lead to an unchecked flow of easily fabricated claims.'" State v. Cox, 109 Wn. App. 937, 941, 38 P.3d 371 (2002) (quoting In re Alvernaz, 2 Cal. 4th 924, 938, 830 P.2d 747 (1992)). Daley cannot show prejudice based on his bare assertion alone. State v. Crawford, 159 Wn.2d 86, 99-102, 147 P.3d 1288 (2006). Daley, again, fails to show that counsel's assistance was ineffective or that he was prejudiced thereby.[6]

---

[5] This belies Daley's claim that his attorney was ineffective in failing to notify him of the plea bargain until the day before trial. Clearly, the negotiations were ongoing.

[6] The record also does not support Daley's assertion of an intent to plead guilty. At sentencing, he explained to the court that he opted to go to trial because "I felt I stood a better chance at the law not being violated and respected in that the evidence would allow me to be free with my family."

F

Finally, we reach Daley's claim that he received ineffective assistance of counsel at his sentencing hearing due to his attorney's lack of preparedness. In contrast with the claims of ineffective assistance discussed above, in this instance defense counsel's conduct clearly fell below a professional standard of reasonableness. On the date originally set for Daley's sentencing hearing, his attorney failed to prepare, or provide the court with a copy of, Daley's sentencing memorandum. Instead, she drafted only a handwritten statement, earning her a rebuke for what the court described as a "quite frankly slip-shod practice" that was inappropriate, given the gravity of Daley's convictions and the length of his prospective sentence.

However, no prejudice resulted from defense counsel's error. The court simply instructed Daley's attorney that a request for a continuance was the appropriate remedy if she could not complete the sentencing memorandum on time. The court then continued the sentencing hearing. In doing so, it remedied any harm that otherwise might have arisen from Daley's attorney's initial unpreparedness.[7]

IV

Last, Daley claims that his sentence violates the Eighth Amendment and that resentencing is warranted because "the trial court erred in failing to take into account Daley's youth as a mitigating factor" that would justify exceptional

---

[7] There is no indication in the record that Daley's attorney was unprepared on the day that Daley was actually sentenced.

concurrent sentences and concurrent firearm enhancements. All of these claims are time-barred.

A

RCW 10.73.090(1) provides that no collateral attack on a criminal conviction may be filed more than one year after the judgment becomes final so long as the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction. Daley's conviction became final upon the issuance of our mandate on June 17, 2016. RCW 10.73.090(3)(b). While Daley filed his personal restraint petition on May 31, 2017, his supplemental briefing raising these sentencing issues was filed on December 7, 2017, well over one year after the judgment became final. To avoid the one-year time bar, Daley relies on RCW 10.73.100, which provides:

> The time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on one or more of the following grounds:
> . . .
> (6) There has been a significant change in the law, whether substantive or procedural, which is material to the conviction, sentence, or other order entered in a criminal or civil proceeding instituted by the state or local government, and either the legislature has expressly provided that the change in the law is to be applied retroactively, or a court, in interpreting a change in the law that lacks express legislative intent regarding retroactive application, determines that sufficient reasons exist to require retroactive application of the changed legal standard.

To bring his challenge within this exception, Daley argues that the Supreme Court's decision in State v. O'Dell, 183 Wn.2d 680, 358 P.3d 359 (2015), effected a significant change in the law material to his sentence.

24

However, in Light-Roth, the Supreme Court expressly rejected this assertion. In

pertinent part, the court stated:

> Contrary to Light-Roth's contentions, RCW 9.94A.535(1)(e) has always provided the opportunity to raise youth for the purpose of requesting an exceptional sentence downward, and mitigation based on youth is within the trial court's discretion. [O'Dell, 183 Wn.2d] at 698-99 ("We hold that a defendant's youthfulness can support an exceptional sentence below the standard range . . . and that the sentencing court must exercise its discretion to decide when that is."). The fact that Light-Roth misinterpreted [State v. ]Ha'mim[, 132 Wn.2d 834, 846, 940 P.2d 633 (1997)] is of no consequence in determining whether O'Dell constitutes a "significant change in the law." . . .
>
> . . . .
>
> It is also significant that, in O'Dell, we found the trial court's "failure to exercise discretion is itself an abuse of discretion subject to reversal." 183 Wn.2d at 697. A trial court cannot abuse discretion it does not have. If Ha'mim precluded trial courts from considering youth as a mitigating factor, we would have ruled that it was an error of law for the trial court to refuse to consider youth in O'Dell. See Williams v. Tilaye, 174 Wn.2d 57, 61, 272 P.3d 235 (2012) ("Statutory interpretation is a question of law reviewed de novo"). Here, Light-Roth could have argued youth as a mitigating factor, as he was permitted to do so under Ha'mim.
>
> Because O'Dell does not constitute a "significant change in the law," we do not reach whether it applies retroactively or is material to Light-Roth's case.

Light-Roth, 191 Wn.2d at 336-38 (footnote omitted).

Daley's argument, as with the defendant's argument in Light-Roth, is time-

barred. We will not consider it.

B

Daley next argues that his sentence as imposed violated the Eighth

Amendment. In doing so, he relies on the proposition that the Supreme Court's

holding in State v. Houston-Sconiers, 188 Wn.2d 1, 391 P.3d 409 (2017),

significantly changed the law as it applied to him. In Houston-Sconiers, the

25

Supreme Court ruled that the Eighth Amendment requires that sentencing courts be given absolute discretion to impose concurrent firearm-enhancement terms of incarceration when a juvenile is convicted as an adult. 188 Wn.2d at 9.

In contrast to the 16- and 17- year-old defendants in Houston-Sconiers, Daley was 22 years old at the time he committed his crime and was, thus, an adult. Daley fails to show that the decision in Houston-Sconiers controls sentencing in such a situation. For adult offenders, RCW 9.94A.533(3) precludes the imposition of concurrent firearm enhancements. State v. Brown, 139 Wn.2d 20, 26-27, 983 P.2d 608 (1999). Houston-Sconiers, applying only to juveniles, did not control Daley's sentencing. It does not authorize a time-barred claim.

C

Finally, Daley argues that State v. McFarland, 189 Wn.2d 47, 399 P.3d 1106 (2017), effected a significant change in the law by allowing concurrent firearm-enhancement terms for adults. However, McFarland only recognized the availability of exceptional concurrent sentences for firearm-related convictions. 189 Wn.2d at 55. It distinguished these from multiple firearm enhancements imposed pursuant to RCW 9.94A.533. Neither RCW 9.94A.589(1)(c)—the statute at issue in McFarland—nor the McFarland holding granted sentencing courts the discretion to impose concurrent terms for firearm enhancements when the offender is an adult. McFarland effected no significant change in the law that would bear on Daley's sentence. Thus, all of Daley's claims of sentencing error are time-barred.

The petitioner's requests for relief are denied.

_____ Duyn, J.

WE CONCUR:

_____ Brunun, J    Andrus, A.C.J. _____